BOYLE v. HENNING.

(Circuit Court, W. D. Kentucky. March 31, 1902.)

**1. CONTRACTS—WAGERING TRANSACTION—BURDEN OF PROOF.**

A telegram sent to a New York stock broker, directing him to "sell 100 shares Northern Pacific common at 83," on its face imports an actual sale of the stock for future delivery, and not a wagering transaction; and the burden rests upon the party alleging otherwise to prove that no actual sale and delivery of the stock was intended, and that both parties so understood. If such is shown to be the fact, however, the form of the transaction is immaterial.

**2. STOCK BROKERS—RELATIONS TO CUSTOMERS—USAGES OF EXCHANGE.**

An order by a customer to a New York stock broker to sell stock must be considered as having relation to the usages of the New York Exchange, and where the same are shown they will govern the rights of the parties in their relations to and dealings with each other.

**3. SAME—DEMAND FOR MARGINS.**

Where, by the usages of a stock exchange, a broker instructed by a customer to sell stock, where the customer does not furnish the stock, is authorized to borrow the same for delivery to the person to whom it is sold, being protected against loss in the transaction by security or margins deposited by the customer, he may demand additional margins when unwilling to longer stand bound to repay the borrowed stock without further protection; and unless the same is furnished within a reasonable time after notice to the customer he has the right to take such fair and reasonable steps for the purchase of the stock to repay that borrowed as may be necessary to prevent loss to himself and to charge the cost thereof to the customer's account, being liable only for a failure to exercise reasonable care and skill in the matter of making such purchase.

**4. SAME.**

All demands by a stock broker upon his customer for margins must be specific, definite, and certain, and the customer is entitled to a reasonable time, under all the circumstances of the case, and taking into consideration the amount demanded, within which to comply with such demand.

**5. SAME.**

No demand made by a broker on his customer for margins is specific, unless it mentions a particular sum of money, or unless it states facts from which a particular amount of money may be certainly ascertained.

## At Law.

Plaintiff was a resident of Louisville, Ky., and defendant was a stock broker in New York. His brother S. C. Henning, while not connected with defendant in partnership, executed most of his orders on the stock exchange of New York through defendant. Plaintiff had for years bought and sold stock through both offices as a matter of convenience, sending his orders to New York over the private wire of S. C. Henning. In December plaintiff directed defendant to sell 100 shares of Northern Pacific common. Defendant sold the stock himself, furnishing it for delivery, and credited plaintiff's account with the proceeds. The stock gradually rose until May 6, 1901. While it was selling at $120 a share on that day plaintiff sold short 200 shares at $120 through S. C. Henning, who executed the order through defendant, who borrowed it for delivery, and credited the proceeds of the sale to the account of S. C. Henning. Northern Pacific stock continued to rise, until on May 9th it sold at $1,000 per share. During that time J. W. Henning was continually calling by telegraph for margins and borrowing stock, paying very large premiums daily for the loan, and made various efforts to obtain some definite response from plaintiff as to the matter of closing out the stock which he held. S. C. Henning, on request of defendant, made many efforts to find plaintiff, and being unable to do so telegraphed defendant to that effect, and authorized him to proceed independently in the matter. Fri-

day, May 10th, plaintiff went to New York, and remained there for a week, during which time he did not call on the defendant, but returned to Louisville, and on the 24th of May notified defendant that he repudiated the purchase of the Northern Pacific stock made by the defendant in order to cover the shares sold him at plaintiff's request. At 11 o'clock Thursday, May 9th, plaintiff's account was about $50,000 deficient in margins on the stock sold, and when the stock was covered he was about $26,000 deficient. Plaintiff subsequently sued to recover $25,030.61, the amount of the margins which he had on deposit with defendant, eliminating the Northern Pacific trade entirely. Defendant thereupon filed a counterclaim for $45,537.50, being the amount of plaintiff's debit after the credit on account of the margin on hand. A verdict was rendered on the counterclaim for the amount of such deficit in favor of the defendant.

Humphrey, Burnett & Humphrey, Helm, Bruce & Helm, Fairleigh, Straus & Eagles, Hornblower, Bryne, Miller & Potter, and Charles A. Boston, for plaintiff.

Wm. Marshall Bullitt and Charles H. Gibson, for defendant.

EVANS, District Judge (charging jury). Without going into details, it may be well to summarize in a general way the respective contentions and claims of the parties as shown by the pleadings, so as possibly to assist you in understanding the issues of fact now to be submitted for your determination.

The plaintiff in his petition asserts demands against the defendant amounting in the aggregate to $25,030.61, made up of $9,830.61, which he alleges the defendant held for him on April 30, 1901, as the result of certain transactions in buying and selling sundry stocks other than the 100 shares of Northern Pacific, $5,000 deposited by plaintiff with defendant on May 8, 1901, $3,000 deposited by him with defendant on May 9, 1901, and $7,200, the proceeds of the sale by defendant for plaintiff of 100 shares of the capital stock of the Chicago, Indianapolis & Louisville Railroad Company. These claims in plaintiff's favor, amounting, as stated, to $25,030.61, are all admitted by the defendant to be due from him to the plaintiff.

The defendant, however, while admitting on the one hand the justness of the plaintiff's demands, says, on the other, that the plaintiff owes him over $46,000, and that after deducting therefrom the $25,030.61, which he owes the plaintiff, the plaintiff is indebted to him a balance of $21,117.40. The nature of the defendant's counterclaim against the plaintiff may be briefly stated thus: He claims that the plaintiff as principal, in December, 1900, employed the defendant as a broker to sell for the plaintiff 100 shares of the common stock of the Northern Pacific Railroad Company at $63 per share; that the plaintiff agreed to pay him therefor a commission of one-eighth of 1 per cent. on the par value of the stock, and such other expenses as might be properly and necessarily incurred by the defendant in the transaction; that, plaintiff not supplying him with the said 100 shares of stock the defendant, pursuant to said employment, and by the authority and under the directions of the plaintiff, sold said 100 shares of stock at the price named, and borrowed the same from another person, and delivered it to the purchaser, who thereupon paid him $8,300 therefor, with which sum, less $12.50 commissions, the defendant credited the plaintiff; that he at once notified and informed the plain-

tiff of said sale and of the borrowing of said stock, and that plaintiff ratified and confirmed the same; that the situation respecting said stock remained thus until May 7, 1901, on which day the defendant, having been called upon to return the stock thus borrowed, did so, and again borrowed the same number of shares thereafter and replaced it, of which the plaintiff was notified, and which he ratified and approved, and that the defendant was compelled to pay and did pay for the said loan of said stock $500, and that on May 8, 1901, having been called upon to return the stock thus borrowed, did so, and again borrowed the same number of shares therefor and replaced it, of which the plaintiff was notified, and which he ratified and approved, and that defendant was compelled to pay for said loan thereof the further sum of $3,500, both of which sums are claimed to have been expenses proper and necessary to be incurred in the execution of the plaintiff's order, and to have been authorized by him; that though notified and required to do so the plaintiff did not supply the defendant with said stock either to deliver to the said purchaser or to the person from whom the defendant had borrowed it for the purposes aforesaid; that the persons from whom it was borrowed demanded its return, of which demand the defendant notified the plaintiff; that defendant required of the plaintiff, and so notified him, that he should deposit two further sums—one on May 8, 1901, of $10,000, and one on May 9, 1901, of $15,000—to protect the defendant against loss on account of said transaction, but the plaintiff, excepting $3,000 on the 9th, neither sent either of said sums nor supplied the defendant with the shares of stock, but that instead the plaintiff authorized the defendant to terminate the transaction, and to buy 100 shares of the common stock of the Northern Pacific Railroad Company, and that on May 9, 1901, the plaintiff telegraphed defendant to make the best settlement he could unless he could see his way clear to carry it without too much cost; that under these circumstances, and not seeing his way to carry it, the defendant went upon the market, and bought the 100 shares of said stock at the best price at which he could obtain it; that in doing so he exercised his best judgment and discretion; that he had to pay and did pay therefor the sum of $50,000, being at the rate of $500 a share; that this was the lowest price at which he could at the time procure the stock, and that with the stock thus bought he replaced the stock he had borrowed in the execution of the plaintiff's order; that the plaintiff was properly notified of all this, and ratified and approved it; that after charging the commissions agreed upon and the $4,000 expenses incurred, and after giving credit by the $8,300 received for the stock in December, 1900, and after giving credit by another small item named, and after then deducting the $25,030.61 admitted by the defendant to be due to the plaintiff, there still remained owing from the plaintiff to the defendant the balance stated of $21,117.40.

You will observe, gentlemen, that there is no dispute between the parties concerning the plaintiff's claim of $25,130.61. That sum is admitted by the defendant to be due from him to the plaintiff. The only contentions are those which grew out of the counterclaim of the defendant against the plaintiff for the forty-six thousand and odd dol-

lars, and which is contested by the plaintiff in three several defenses.

Those defenses may be stated separately, and are, first, a general denial by the plaintiff of all that the defendant alleges upon the subject.

The second defense to the counterclaim is that on the 7th, 8th, and 9th days of May, 1901, there existed what is called a "corner" on Northern Pacific stock; that by reason of that fact practically all the stock of that railroad was withdrawn from the market; that the defendant knew it, and that the plaintiff did not; that the plaintiff gave the defendant no order to buy the stock nor to incur the expenses claimed to have been paid by the defendant for borrowing it, and that the purchase by the defendant of the stock, if he purchased it at all, was in bad faith and without authority, and that it was done recklessly, unskillfully, and negligently under the circumstances then existing; that the plaintiff repudiated the purchase and all the transactions connected with it, and so notified the defendant; and that for all these reasons he is under no liability upon the counterclaim.

As to this defense made by the plaintiff to the counterclaim, the defendant insists to the contrary, and claims that in all he did he acted pursuant to the authority given him by the plaintiff, and within his rights, under the relations existing between him and the plaintiff respecting said transaction, and after the demands for margin made upon the plaintiff and already referred to, and the defendant denies that he made said purchase in bad faith or without authority, or recklessly, unskillfully, or negligently, under the circumstances then surrounding him. He claims to have kept the plaintiff fully advised of the exact situation as far as it was possible to do so; that he frequently telegraphed to the plaintiff or to his agent, and gave him notice of the amount required to protect the stock and the transaction respecting it, but he could get no specific instructions other than those already alluded to; that he acted under his best judgment and in the exercise of his best discretion in making said purchase and in incurring the expenses referred to, and as the plaintiff had authorized him to do. He denies the existence of the alleged "corner" and his knowledge thereof. He denies that the plaintiff repudiated the purchase of the stock or disapproval of the same until long after it had been paid for, although defendant promptly notified the plaintiff of the purchase and of all of the facts concerning it.

To enable you to understand the third defense of the plaintiff to the defendant's counterclaim, it may probably be sufficient to state it in the plaintiff's own language, as found in one of the amended pleadings. That language is as follows:

"The money derived from the short sale was to belong and did belong to the defendant, and he was not to account and did not account for the use thereof. The plaintiff was not to be called upon to furnish any stock for delivery, nor to come under any obligation for such stock, and the plaintiff was not to receive, and did not receive, any stock bought to cover such short sale, nor own or have any interest therein. It was to be left and was left to defendant to accomplish the said transaction in selling the said stock, in procuring it for delivery, if it had to be delivered, and in purchasing it again and receiving any payment for it—all in his own way. The stock so sold was not to be nor was it stock which the plaintiff owned, furnished, or had any interest in, and the proceeds were to be and were the defendant's own prop-

erty, in which plaintiff was to have and had no interest. The plaintiff was to have and had no relation to or contract with any other person than the said defendant, and the defendant had no authority to make any contract whatever with any other person on behalf of or binding upon the plaintiff. The transaction as to plaintiff was only to receive or pay the difference in price as above set forth, and such settlement was to be made in Louisville, Ky."

If these averments be true, the law would require the conclusion that the whole transaction respecting the 100 shares of Northern Pacific Railroad stock was mere wagering upon the rise and fall of the price of that stock, and, being for that reason illegal and unenforceable, the plaintiff would not be liable for any loss resulting to the defendant from anything alleged by him to have been done in respect to that transaction. The defendant in his pleading has explicitly denied the allegations of the plaintiff just read, and insists not only that the intention and understanding of the parties was that the 100 shares of stock was to be actually delivered, but that in fact it was actually delivered pursuant to that intention and understanding. These allegations and denials, and possibly others in the pleadings relating thereto, raise an issue upon this aspect of the case which you will be called upon to settle, and the court will first state the rules of law by which you should be guided in determining it.

A sale of stock "short" means a sale of stock which the seller does not at the time possess, but which, by the future date or time agreed upon for its delivery to the purchaser under the terms of the contract, the seller must in some way acquire for the purpose of such delivery. The parties to this action seem to agree that the initial and only authority given to the defendant is contained in four telegrams, which may be correctly reduced to one in these words, viz.: "Sell 100 shares Northern Pacific common at 83."

The telegram thus reduced on its face does not show or indicate of itself a gambling transaction. That characteristic of the transaction respecting the deal in this 100 shares of stock, if it existed at all, must depend upon other considerations. The telegram purports to order the defendant to sell for the plaintiff 100 shares of Northern Pacific common stock at 83; being sent to New York to a broker there, must be considered as having been intended to have relation to the usages in the New York market for executing such orders. On their face such transactions are legal, and the law does not, in the absence of proof, presume that the parties are gambling. The burden of showing that the parties were carrying on a wagering business, and were not engaged in legitimate trade or speculation, rests upon the plaintiff.

A person may make a contract for a sale of personal property for future delivery which he has not got. Merchants and traders often do this. A contract for the sale of personal property which the vendor does not own or possess, but expects to obtain by purchase or otherwise, is binding if an actual transfer of property is contemplated. A transaction which on its face is legitimate cannot be held void as a wagering contract by showing that one party only so understood and meant it to be.

The proof must go further, and show that this understanding was

mutual; that both parties so understood the transaction. If, however, at the time of entering into a contract for a sale of personal property for future delivery, it be contemplated by both parties that at the time fixed for delivery the purchaser shall merely receive or pay the difference between the contract and the market price, the transaction is a wager, and nothing more. It makes no difference that a bet or wager is made to assume the form of a contract. Gambling is none the less such because it is carried on in the form or guise of legitimate trade.

Though, as I have stated, the burden was upon the plaintiff to establish the truth of the allegations made by him in the part of his pleading which I have just read to you, I recall no testimony which was offered by him on that subject, and certainly no direct testimony upon it; but, on the cross-examination of the plaintiff, the defendant, after identifying that portion of the plaintiff's pleading, himself read it and the statements it makes as evidence.

Under these circumstances, and in view of the arguments made to you upon the subject by the defendant's counsel, I call your attention to this defense to the counterclaim, and charge you that if, upon a careful consideration of all the evidence in the case bearing directly upon this proposition, you shall find that all the statements made in that part of the plaintiff's pleading just read to you are true, then, and not otherwise, you would be authorized to conclude that the transaction was one of mere wagering, provided you also find from the evidence the existence as facts of the other elements which I have charged you were necessary to make it a wagering transaction. As already indicated, however, the understanding and intention of one party alone that it should be so would not be sufficient to make the transaction one of wagering or gambling unless the understanding and intention of both were the same. In other words, the intention and understanding of the parties, in order to constitute a wagering transaction, must be mutual, to the effect that there was to be no actual delivery of the stock, but only a settlement of differences between the contract price and the price of the stock at the time fixed in the contract of its delivery. And the fact, if it be so found, that the defendant was acting only as a broker, executing the orders of the plaintiff, should be carefully considered and given its due weight in reaching a conclusion in this connection.

You should remember, however, that the mere form of the transaction is not the only thing to be considered; for the form of it, if the evidence so warranted, might be found to be a cover for a wagering transaction. So that if you should conclude from the evidence that there should be only a settlement of differences, as I have described that, and a mere speculation upon the rise and fall of prices, instead of a legitimate and valid transaction, as the telegram on its face indicated, then the mere form of the contract would not change that result, though unless there was such mutual intention and understanding it was not a wagering transaction.

I have first alluded to this phase of the case, because, should you find from the evidence that the transaction respecting the 100 shares of stock was a wagering and gambling transaction under the rules

for your guidance which I have laid down, then it will be your duty in that event to find for the plaintiff the amount claimed in the petition, without regard to the counterclaim, which, in that event, cannot be maintained to any extent.

But, on the other hand, should you find this issue for the defendant, and conclude from the evidence that there was no such mutual agreement as would make it wagering, then there are other questions of fact to be determined to which you should give attention, and to all of the evidence bearing upon which you should give the most careful and painstaking consideration. These questions are not quite so easily stated as was the other. They grow out of the rights, duties, and obligations of principal and agent, the one to the other. An agent such as a broker owes certain important duties to his principal, and the principal employing a broker may come under certain important obligations to him. Generally speaking, it is the duty and also the right of an agent to obey the instructions of his principal, and this fact should always be borne in mind; but it is important for you also to remember that there are certain circumstances under which an agent has a right to act for his own protection. In the event that before reaching this point in your deliberations you shall find from the evidence that the transaction respecting the 100 shares of Northern Pacific stock was not one of wagering, I think you may assume from the evidence (though it is altogether for you and not for the court to say) that the order telegraphed by the plaintiff to the defendant in New York to sell 100 shares of that stock was intended to be executed in the New York stock market, and according to the usages and customs of the brokers there, and that those usages authorized the broker on selling the stock "short"—that is, for future delivery—if it is not supplied by the principal, to borrow it and deliver it to the person to whom it was sold, provided that satisfactory security against loss in the transaction be given to the broker or be deposited with him by the customer. If at any time thereafter the broker becomes unwilling to stand any longer bound to deliver or to return the stock borrowed without additional margin or security being deposited to secure him on his obligation to do so, he has the right to notify his principal of that fact, and to demand of him the payment or deposit of such additional margin or security as the broker may require and definitely specify; and if, after demanding of his principal such further deposit of money as security against loss to himself, the principal does not promptly, and within a reasonable time after receiving such notification, make deposit of such additional margin as had been required, then the agent has the right, as will presently be more specifically charged, to take such fair and reasonable steps for the purchase of the stock to cover the contract as may be necessary to prevent loss to himself, and this right, under those conditions, in a case like this, is equivalent to an instruction by the principal to the agent to purchase stock for the purpose indicated. There does not seem to have been any dissatisfaction upon the part of the broker in this case with the amount of margin deposited by the plaintiff until the approach of May 9, 1901. As that time approached certain of the telegrams which have been

read in evidence were sent, and it is entirely for you to say upon the evidence when they were sent and when received, and which and what parts of those sent by S. C. Henning were sent by the authority of the plaintiff; for such telegrams are binding upon him only to the extent that they were sent by the plaintiff's authority, or with his subsequent approval. If the plaintiff did not, by the telegrams presently to be read, when fairly interpreted by you, give instructions to the defendant to purchase the 100 shares of stock, or if the defendant had not given to the plaintiff notice of the requirement of an additional margin of a definite amount, and had not made a demand for the deposit of the amount of additional margin so required of the plaintiff within such reasonable time before proceedings to purchase as would give the plaintiff a fair opportunity to comply with such demand, or if those telegrams when fairly interpreted by you only authorized what has been spoken of in the evidence as a private settlement of the transaction, then the defendant had no authority to purchase the 100 shares of stock on May 9, 1901, and the plaintiff would not be bound by anything done by the defendant in making or attempting to make such purchase unless he afterwards ratified or approved the same.

The defendant claims that the plaintiff gave him express authority to purchase the stock, and in order to show that to be the case relies upon certain telegrams from the plaintiff and other evidence which has been heard. Two of the telegrams read in connection and orderly sequence with two others from the defendant to plaintiff are as follows:

"New York, May 7th, 1901. Time sent, 4:18 p. m. To Stephen, care S. C. Henning, Louisville, Ky. Northern Pacific practically cornered, loaning at five per cent. per day.                                                     J. W. Henning."

"Louisville, Ky., May 8th, 1901. Time received, 11:23 p. m. To J. W. Henning. Will remit you 5,000 to-day. If N. P. corner not complete carry short sale best terms you can. If you cannot carry it settle best you can.
                                                                                          "Boyle."

"New York, May 8th, 1901. Time sent, 4:34 p. m. To St. John Boyle, care of S. C. Henning, Louisville, Ky. Northern Pacific is securely cornered and loaned to-night as high as fifty per cent. I paid thirty-five per cent. premium over night for 100 short in your account. Something should be done. I am not willing to stay short of the stock for customers unless it is margined 100 points and kept good. Please reply and telegraph margin.
                                                                                   "J. W. Henning."

"Louisville, Ky., May 9th, 1901. Time received, 9:36 a. m. To J. W. Henning. Make best settlement you can unless you can see your way clear to carry without too much cost. Sent you through Sam 5,000 yesterday and 3,000 this morning. Treat stock in Sam's account just like yours.
                                                                                          "Boyle."

You will consider those telegrams in connection with all the other evidence in the case, and in view of the possible latent ambiguity therein the court will leave it to you to say whether those telegrams, considered together and in connection with the other telegrams and all the other evidence, authorized the defendant to settle the deal in some other way than by a purchase of the stock, or whether they authorized the defendant, either peremptorily or in the exercise of his

discretion, to buy the 100 shares of stock, as was done by him, or whether they required the defendant to purchase the stock at the market price, either promptly upon their receipt or at any time during May 9, 1901.

The court charges you that if you shall conclude from the evidence that the defendant was positively ordered unconditionally to purchase the stock and close the deal—that is to say, if you shall conclude from the evidence that that was the meaning of the telegraphic directions given by the plaintiff when that meaning is ascertained by you— then it was the duty of the defendant to obey the order and promptly buy the stock; and if without any unreasonable delay, considering all the circumstances surrounding him and the case, he did so, he is entitled to recover the full amount of the price paid for the stock in addition to his agreed commissions for making the purchase, but less the sum of $8,300 which was received by him as the price of the stock when he sold it in December previously. But if there was any unreasonable delay in so doing, or if there was negligence or a lack of diligence or skill in so doing, then you should consider the question from the other points of view to which I will presently call your attention.

The court charges you that if you shall believe from the evidence that the defendant was authorized or instructed to purchase the stock in his discretion—that is to say, if you shall conclude from the evidence that that was the meaning of the telegraphic directions referred to when that meaning is ascertained by you—then if you believe from the evidence that, with the exercise of such care, skill, and prudence as would have been exercised by a reasonably prudent and cautious person under the existing circumstances surrounding him and the case, the defendant made the purchase of the stock in the exercise of such discretion, he would, in that event, be entitled to recover the full amount of the price paid him for the stock, in addition to the commissions agreed upon therefor, but subject to a deduction therefrom of the sum of $8,300 which was received by him as the price of the stock when he sold it in December previously.

If you believe from a consideration of all the evidence that those telegrams did not of themselves direct or authorize the defendant to buy the stock, then he has not shown any authority to do so from the telegrams nor from anything else appearing in the evidence, unless you believe from the testimony that the defendant notified the plaintiff of the requirement of additional margin of a definite amount within such reasonable time before the purchase of the stocks as would have given the plaintiff a reasonable opportunity to comply with the demand before such purchase. Unless you believe from the evidence that the defendant in one or the other ways pointed out— that is, either by the force of the telegrams as they may be construed by you or such notice and demand as I have already pointed out for additional margin within a reasonable time before the purchase— received and had authority to purchase the 100 shares on that day, then his action in so doing was not binding upon the plaintiff, and would not be so binding unless the plaintiff after being fully informed of all the material facts concerning such purchase, either expressly

or by his silence or failure to object thereto within a reasonable time thereafter, ratified and confirmed the same. In this connection the court tells you that a ratification of the acts of an agent may be made in express terms by approving the same in language, or it may be done by implication, but that a ratification to be implied from silence or failure to object must consist of a failure within a reasonable time to object to what had been done after information of all the material facts had been given to the principal. Before the principal in this respect is required to manifest his disapproval of an act of his agent, he is entitled to have a reasonable opportunity to acquire information of all the material facts of the case, and this general principle, as applicable to this case, would entitle the plaintiff to a reasonable time in which to inquire into the facts not only of the purchase itself, but also those which would enable him to form an intelligent judgment upon what had occurred in New York respecting that purchase, and until he had this reasonable time he was not required to repudiate the transaction in order not to be considered as ratifying it. What would be a reasonable time in respect to each of the matters referred to in this connection and in all others mentioned in this charge is for the determination of the jury after a fair consideration of the evidence and of all the circumstances surrounding the parties at the time. The fact, if it be a fact, that the situation in the New York stock market was abnormal and unusual should be carefully considered from the standpoint of both parties. You will bear in mind what I have charged you in the contingency that you shall find from the evidence that no authority or instructions were given to the defendant to purchase the stock, and also in the contingency that you shall find from the evidence that he had no authority to do so by reason of a failure of the plaintiff to deposit additional margin. But if you shall find that the defendant was authorized in his discretion or otherwise to make the purchase of said shares, then another most important question will arise upon the issues presented by the pleadings, and that question you must determine. The law imposes upon an agent authorized to do an act the duty of performing the same with reasonable skill and diligence, and this is quite as true when his compensation is small as when it is large, if he undertake to do the act at all, and it is true also in cases where an agent has discretion as to the time or manner of performing that duty. The question of what is reasonable skill and diligence should also be considered from the standpoint of the character and importance of the duty undertaken by the agent. The test by which you are to determine whether the agent's manner of exercising the duty was reasonably skillful and diligent is this: Would a reasonably prudent and careful man have so performed that duty under the circumstances surrounding him at the time. The situation at the time and the circumstances then surrounding the agent are always to be carefully considered, and when they are considered the question is to be determined by the test of whether a reasonably careful and prudent man would then have acted as the agent then did. If he would have so acted, then the jury would be authorized to say that there was neither negligence nor unskillfulness in the performance of his duty.

121 F.—25

In this case I do not mean by the words "at the time" to limit you to the exact moment when the purchase of the 100 shares was made, but the question is a little broader, and should include this further element: If the defendant had the authority and the discretion to buy the stock, would a reasonably careful and prudent man have exercised that authority on the 9th day of May, or would he have waited, under all the circumstances surrounding him, until a later time? or if such person had bought on that day would he have done so at the time defendant purchased, or would he have done so at an earlier or later hour? are all questions which should also be included among those you should consider in an effort to solve the problem.

It is contended on the one side and denied by the other that if the defendant had borrowed the 100 shares of stock, and had paid $3,500 for doing so, its return by him was not demandable until 15 minutes past 2 o'clock of the afternoon of May 9th, and that upon those further grounds it was reckless, negligent, and unskillful conduct on the agent's part to purchase the stock before that hour, by which time it is claimed that the stock had greatly declined in price. I charge you also to carefully consider this phase of the case and all the evidence bearing upon it in reaching your verdict.

You have heard the evidence on the subject, and you have heard all of the arguments, and it is for you to say whether a reasonably prudent and careful man, under the circumstances surrounding the agent and the case, would have bought the stock on the 9th day of May, or whether he would have bought it about 1 o'clock of that day instead of at an earlier or later hour, or whether he would have stayed out of the market on that day and have exercised his discretion at a subsequent day, say not later than the 10th. In reaching a conclusion on this subject you should carefully consider all the circumstances bearing upon it, and all the circumstances then surrounding the agent who had a difficult problem to solve. If you conclude from the evidence that the defendant was authorized to purchase, and also that a reasonably careful and prudent man would have purchased, the 100 shares at the time on the 9th of May when he bought, then you should find in his favor on that account for the net sum of $41,725, or such part thereof as you may believe from the evidence was expended by him in such purchase, including his commission on the transaction; but this is subject to what I now also charge you, namely, that should you find that the defendant had the authority in his discretion to purchase the stock as the plaintiff's agent and for his account, still if you find from the evidence that in making such purchase he did not do so at a time or in a manner or at a price such as a reasonably prudent and careful man would have done under the circumstances then existing, then the defendant is not entitled to recover all of the said last-named sum, nor any greater part thereof than would have been expended in the execution of such authority to purchase (if it existed) by the exercise of such reasonable care and diligence as would have been used by a reasonably prudent and cautious person in exercising such authority, and in that event you should make an estimate of what sum would have been expended in such purchase (if authorized) by a reasonably pru-

dent and cautious person within a reasonable time after the authority was given; and the jury in determining this question and in estimating this amount may take into consideration the amount at which such purchase could have been made promptly after the authority to make such purchase was given by the plaintiff, or after the right to make such purchase had arisen upon any notice and demand for additional margin, such as I have referred to, if any such was made, and also the amount that would have been expended at a later hour. In other words, if the defendant had orders or authority in his discretion to purchase the stock, and undertook to do so, it was his duty to do it with reasonable skill and diligence, as I have explained to you; and, if he failed to exercise such reasonable skill and diligence in making the purchase, then the plaintiff, under the issues made by the pleadings, should not be required to pay for the stock bought any amount in excess of the price which the defendant would have had to pay for it if in making the purchase he had exercised that degree of care and skill which an ordinarily prudent person would have used in executing such order and authority under the circumstances surrounding the defendant, and from any amount thus found you should, of course, deduct the $8,300 in his hands.

You have heard evidence of the market price and value of Northern Pacific common stock on May 10, 1901, and also as to the price paid for that stock on that day in private settlements outside of the stock exchange—of transactions respecting "short" sales of that stock by persons other than parties to this suit. Inasmuch as the court has left it to you to interpret the meaning of the orders given, and to ascertain whether or not, properly interpreted, their force, if they are discretionary, would extend over a period of time including May 10, 1901, I will also leave it to you, if you find that to be true, also to determine whether a reasonably cautious and prudent man, in executing such orders, would have done so on May 9, 1901, or whether if the force of the orders, as that meaning may be ascertained by you, would extend beyond that day, such a man would have delayed executing it until May 10th, because if you should find that the orders to the defendant were such as that they might, within their proper meaning and scope, operate during a period long enough to include the 10th of May, then the evidence referred to would be proper and important for you to consider; but I charge you that unless you should interpret the orders to have such a meaning as might embrace time for their execution after May 9, 1901, then you should entirely disregard all of that evidence, because, in that event, you should in no wise hold the defendant responsible for anything that occurred on the 10th of May. His responsibility in that event should depend alone on what had occurred on the 9th, and his conduct should be judged by what occurred then and by the circumstances then surrounding him, and in no sense by what occurred after May 9th.

I shall not undertake to define the word "corner," nor to ascertain the rights of persons involved in one, because it does not seem to me that there is sufficient evidence to connect the defendant either with forming or conducting a corner; but it is apparent from his telegram that he knew of the existence of a state of facts which he

therein called a "corner," and that is one of the elements of the evidence which you are to consider in determining whether a reasonably cautious and prudent man would have made the purchase under the circumstances then surrounding the defendant, including those which were called by the defendant a "corner."

There does not seem to me to be sufficient proof of any actual bad faith on the part of the defendant in making the purchase, and you should disregard that phase of the case altogether, and consider those only which I have submitted to you.

There are three other items embraced in the defendant's counter-claim, one of which is an item for $12.50 commissions for the purchase of the stock, another is an item of $500 for premiums paid for carrying the stock on the 7th day of May, and another is an item of $3,500 for premiums paid for carrying the stock paid on the next succeeding day.

These sums are said by the defendant to be entitled to a credit of $187.50 otherwise due to plaintiff. If the defendant was authorized to purchase the stock of course he was entitled to the $12.50 commission therefor. The other two items are sums alleged to have been paid by the defendant for carrying or borrowing the 100 shares after the sale in December and before the purchase in May. If you shall believe from the evidence that the plaintiff authorized the defendant to carry the stock and make the necessary expenditures to enable him to do so, and if you further believe that he did make the expenditures (and I may say that there was no contradiction of the evidences of payment), and if you believe from the evidence that they were in whole or in part necessary and proper, then to the extent that you should find from the evidence that they were authorized and were necessary and proper you should find on that issue for the defendant, and charge the plaintiff with the amount so found. But if you should conclude from the evidence that they were not authorized by the plaintiff, or, whether authorized or not, if you find from the evidence that they were not necessary or proper expenditures, then to the extent that they were not so authorized or proper you should find on that issue for the plaintiff.

To briefly summarize, you should in any event charge against the defendant the sum of $25,030.61 which he admits he owes to the plaintiff. Having done that, you should then determine upon the evidence and pursuant to the principles I have stated to you what, if any, sums you should charge against the plaintiff, namely: First, what amount, if any, for commissions, not exceeding $25; second, what amount, if any, not exceeding $4,000, you should charge against him for premiums alleged to have been paid by the defendant for borrowing the stock; and, third, what part, if any, of the $50,000 alleged to have been paid by the defendant for the stock should be charged to the plaintiff. After you have settled as to these three items the amounts, if any, which should be charged against the plaintiff, you should deduct therefrom $8,300 and also $187.50, and the balance, if any, you should charge against the plaintiff. Having thus ascertained the amounts to be charged against the parties, respectively, your verdict should be in favor of the one or the other as the balance

may appear, and in your discretion you may add thereto interest upon the balance from the time it should have been paid.

Gentlemen, you should endeavor to remember and fully consider all the testimony in the case. Upon the evidence, and upon it alone, you must settle the important issues of fact submitted to you. That you will endeavor to do so fairly and with a just regard to the rights of both parties I do not doubt. You, and you alone, are the judges of the weight and credibility of the evidence. With that phase of the case the court has nothing to do. Ordinarily I might attempt to give you some aid by commenting upon the evidence, but in this case its volume is so great that I shall not attempt it.

The parties, respectively, have asked the court to further charge you upon certain points. As I think I have adequately charged you upon the rules of law by which you are to be governed upon every applicable hypothesis, I do not find it proper to further charge you at the instance of either party, with these exceptions, namely, the plaintiff requests the court to charge you as follows:

"(1) All demands by a stock broker upon his customer for margins must be specific, definite, and certain, and the customer is entitled to a reasonable time, under all the circumstances of the case, within which to comply with any demand which may be made by his broker upon him.

"(2) That no demand for margins is specific unless it mentions a particular amount of money, or unless it states facts from which a particular amount of money may be certainly ascertained."

I do so charge you, and make this additional remark: The reasonable time referred to might be of greater or less extent in proportion to the amount of margin demanded, if a specific demand was made, and it might also depend upon the other circumstances of the case, all of which should be considered by the jury.