FRANCES BARTOW FARR, EXECUTRIX, AND HENRY BARTOW FARR, EXECUTOR OF THE ESTATE OF JOHN FARR, DECEASED, PETITIONERS, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 76712. Promulgated November 26, 1935.

N. N. Mayer, Esq., for the petitioners.
Paul A. Sebastian, Esq., for the respondent.

### OPINION.

MURDOCK: The Commissioner determined a deficiency of $715.77 in the income tax of John Farr, deceased, for the year 1932. This proceeding was instituted by the executor. His assignments of error attack the action of the Commissioner in taxing the entire amount of gain from the disposition of 1,280 shares of Central Aguirre Associates stock as ordinary income subject to normal tax and surtax, instead of taxing all, or a part, of the gain as capital gain. The facts have been stipulated.

The decedent, on January 1, 1931, was the owner of 9,500 shares of stock of Central Aguirre Associates. He had held those shares at that time for more than two years. He " sold short " 1,280 shares of Central Aguirre Associates at various times during the year 1931 for a total consideration or price of $25,613.80. He " covered the short sales " on March 22, 1932, by delivering 1,280 of the shares which he had held for more than two years on January 1, 1931. The shares used to cover had cost him $8,320. The Commissioner, in determining the deficiency for 1932, computed a profit of $13,-980.59 from the sale of the Central Aguirre Associates stock and taxed it as ordinary income subject to normal tax and surtax.

The parties agree that the gain is taxable in 1932. Cf. Charles H. Oshei, 31 B. T. A. 23. The treatment for tax purposes of stipulated amounts paid by the decedent in 1931 and 1932 representing dividends on the stock " sold short " does not seem to be in controversy. The cost of the stock delivered to cover and the price at which the stock was sold are not in dispute. The case presents only the legal question of how the gain is to be taxed, i. e., whether all of the gain is to be taxed as ordinary income or whether all or some part of it is to be taxed as capital gain.

Section 101 of the Revenue Act of 1932 provides a special method of taxing capital net gains. It defines " capital gain " and " capital loss " as the gain or loss from " the sale or exchange of capital assets." " ' Capital assets ' means property held by the taxpayer for more than two years." The gain in question would clearly be a capital gain under those provisions, if they stood alone, since the shares which the decedent disposed of had been held for more than two years even before he made the " short sales." The question arises because of the provisions of section 23 (s). Those provisions, as well as the provisions of section 23 (r) which may have some bearing upon the question, are as follows:

SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(r) LIMITATION ON STOCK LOSSES.—(1) Losses from sales or exchanges of stocks and bonds (as defined in subsection (t) of this section) which are not capital assets (as defined in section 101) shall be allowed only to the extent of the gains from such sales or exchanges (including gains which may be derived by a taxpayer from the retirement of his own obligations).

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(s) SAME—SHORT SALES.—For the purposes of this title, gains or losses (A) from short sales of stocks and bonds, or (B) attributable to privileges or options to buy or sell such stocks and bonds, or (C) from sales or exchanges of such privileges or options, shall be considered as gains or losses from sales or exchanges of stocks or bonds which are not capital assets.

The Commissioner stated in the notice of deficiency that " the Bureau is adhering to the principle laid down in Income Tax Ruling 2683, wherein it is held that the gain or loss from short sales ' is to be treated as resulting from sales of securities which were not capital assets, in accordance with section 23 (s) of the Revenue Act of 1932, regardless of the fact that the securities which were later delivered may have been held more than two years '." Counsel for the Commissioner stated at the hearing that the Bureau was considering whether or not it would reverse its ruling as set forth in I. T. 2683, C. B. XII–1, p. 43. He was to file a brief but failed to do so. The Commissioner has made no argument in support of his determination. The petitioner's brief and a brief *amicus curiae* have been filed opposing the view adopted by the Commissioner.

The question is whether the petitioner realized any gain from a short sale of stock within the meaning of the phrase " short sales " as used in section 23(s). The first step is to determine what is meant by " short sales." Congress did not define the term and, therefore, must have intended it to have its usual and generally understood meaning. *Avery* v. *Commissioner*, 292 U. S. 210; *De Ganay* v. *Lederer*, 250 U. S. 376; *Old Colony Railroad Co.* v. *Com-*

*missioner*, 284 U. S. 552; *Woolford Realty Co.* v. *Rose*, 286 U. S. 319. Short sales have been employed by business men for several centuries at least. Section 23 (s) applies only to short sales of stocks and bonds. Although the provision is not limited in its application to sales made through the New York Stock Exchange, nevertheless, the practice there is of importance in deciding what is the generally understood meaning of " short sales." A " short sale ", as used on the New York Stock Exchange, is a device which has certain well established characteristics and incidents. These have been the subject of discussion by courts and financial authorities. A short sale made on the exchange is necessarily a margin transaction. The broker must agree to make the transaction as a short sale. *Zimmerman* v. *Weber*, 135 App. Div. 428; 120 N. Y. S. 483. When a broker has agreed to make a short sale for his customer, he next makes a sale in the regular way on the exchange. Certificates for the shares sold must be delivered to the purchaser on the following day under the rules of the exchange. The broker, by agreeing to handle the transaction as a short sale, has obligated himself to provide the certificates for delivery. His customer is not to provide them as he would in a regular sale. Unless the broker has available certificates of his own, he must " borrow " certificates for delivery.[1] In any event, certificates are actually delivered to the purchaser and the transaction, from his standpoint, is just like any other purchase. If the seller's broker " borrows " the stock, he must keep on deposit with the " lender " the current market price of the stock " borrowed." The broker who makes the short sale for his customer receives the purchase price from the purchaser. He, therefore, has this money available with which to make the deposit with the " lender." He will also require his customer to keep on deposit with him a sufficient margin to protect him against market fluctuations in the stock. The " borrowed " stock must be returned eventually.[2] The transaction which originated in the short sale may be closed by the return of stock purchased just for that purpose. This is called a " covering purchase." The transaction may also be closed by the short seller delivering, in return for those " borrowed ", certificates which he had purchased at an earlier date. When certificates are returned to the " lender " he releases the deposit made by the broker for the seller. Regardless of the method of accounting used by the seller's broker, whatever balance there is in the account is completely available to the short seller for the first time when the transaction is

---

[1] It is, however, possible to cover a short sale before the time for delivery.

[2] The Supreme Court, in *Provost* v. *United States*, 269 U. S. 443, has held " that both the loan of stock and the return of borrowed stock involve ' transfers of legal title to shares of stock ' within the express terms of " the War Revenue Act of 1917 imposing a tax upon such transfers.

closed by the delivery of shares which are to be returned to the lender. For further discussion of the characteristics and incidents of a short sale see *Provost* v. *United States*, 269 U. S. 443; *Boyle* v. *Henning*, 121 Fed. 376, 380; *Hess* v. *Rau*, 95 N. Y. 359; *Knowlton* v. *Fitch*, 52 N. Y. 288; *Appleman* v. *Fisher*, 34 Md. 540; *Lamprecht* v. *State*, 84 Ohio, 32; 95 N. E. 656; *Brown* v. *Carpenter*, 168 N. Y. S. 921; Stock Brokers and Stock Exchanges, Dos Passos, 2d Ed. 1905, vol. 1, pp. 200, 323 to 326; Options and Futures (1921), McMath, p. xxxii.

A short sale is defined by J. Edward Meeker, economist to the New York Stock Exchange, in his work on " Short Selling ", published in 1932, as a sale which creates a debt in terms of goods. He classifies in three groups the principal purposes for which the device is generally used in connection with securities. He places in one class the short sales made to obtain speculative profits. Persons who employ the device for this purpose make a short sale in the expectation that later they will be able to close the transaction by a covering purchase at a lesser price. Such persons in exchange parlance are called " bears." The short sale device is employed as a temporary facility in another class of cases. An investor, owning securities and desiring to make an outright sale of some of the securities which he owns, may not have his certificates available for delivery in accordance with the rules of the exchange. For example, the certificates may be held at some point distant from New York, the owner may be away from home, or, due to mergers, consolidations, stock dividends, changes in par value, and the like, the certificates may not be available for prompt delivery. Therefore, the short sale device is employed in order to effect a sale at market and yet permit a later delivery of certificates by the seller. In the third class are short sales made for the purpose of " hedging." These are called also " sales against the box." They occur when an owner of stock resorts to a short sale in order to avoid the risk of future price fluctuations. He owns sufficient securities to make delivery, but chooses to make a short sale involving the borrowing of shares for delivery, rather than to sell and make delivery of the shares which he owns. The owner of a large block of stock, which gives him a measure of control over the affairs of the corporation, may desire to take advantage of the current market price and yet retain his control in the corporation. He can accomplish his purpose by making a short sale. Later, if the stock declines, he can make a covering purchase and realize a profit, or, if the stock advances, he can make delivery of his own stock and lose control, or make a covering purchase and sustain a loss. Hedging is also resorted to by the " odd lot dealers " on the floor of the exchange in order to avoid the risk of owning a large block of stock. It is also adopted by professional speculators who seek to profit by buying in the cheaper and

selling in the dearer market, where the same security is listed on two different exchanges. As authorities for the statements in this paragraph see Short Selling (1932), Meeker; The Work of the Stock Exchange (1922), Meeker; Short Selling (1933), Owen Taylor; Short Selling, For and Against (1932), Whitney and Perkins.

Thus, a short sale may be made, not only by one who does not own any securities of the kind which he sells, but also by one who actually owns securities of the kind he sells. Short sales must frequently be made by brokers who are not informed whether or not their principal is the owner of shares which he could sell and deliver if he so desired. One of the chief differences between a regular sale and a "short sale" is that, in the former, the seller delivers his own shares to the purchaser and thus closes the transaction, while in the latter, he delivers "borrowed" shares and the transaction is not closed so far as the seller is concerned until he delivers shares to repay the "loan." If the shares sold are not furnished by the seller at the time of the sale but are supplied by the broker, the transaction is a short sale and sets in motion the short sale process. The fact that a transaction is a short sale must appear prior to the time when the broker must make delivery in accordance with the rules of the exchange. A transaction, which at that time, or earlier, is made as a short sale, forever remains a short sale, regardless of the manner in which it is closed, that is, regardless of whether it is closed by a covering purchase or by the delivery of shares which the seller has owned for some time.

The Supreme Court in the *Provost* case, *supra*, said:

As the phrase indicates, a short sale is a contract for the sale of shares which the seller does not own or the certificates for which are not within his control so as to be available for delivery at the time when, under the rules of the Exchange, delivery must be made.

A short sale has been similarly described by other courts and financial writers. See authorities above cited. The argument is advanced that the sale made by Farr was not a short sale within the above definition. The Court in the *Provost* case might not have had in mind a situation where the seller was long on the stock and may not have intended the definition as an all-inclusive one. However, the sale which Farr made was a short sale even under that definition. He did not sell in 1931 any shares which he owned at that time, but retained all of the shares which he then owned until March 22, 1932. The shares which he sold in 1931, pursuant to his contracts of sale, were shares which he borrowed from or through his broker. The stipulation of facts makes this clear. Furthermore, if the shares sold and delivered in 1931 could be identified by the certificates which were delivered, such identification would disclose that they were not shares owned by Farr. Thus he made a short sale, since he sold

shares which he did not own. Some cases contain dicta to the contrary which apparently arose from a partial misunderstanding of a short sale. We therefore conclude, after a rather exhaustive search of the authorities, that the sale which Farr made was a short sale within the usual and generally understood meaning of that term.

The gain or loss from a short sale is ascertained by matching the short sale price against the cost or other basis of the stock used to close the transaction. *Robert W. Bingham*, 27 B. T. A. 186. Here the decedent realized but one profit which the Commissioner seeks to tax. That profit is the difference between the cost of the 1,280 shares delivered in 1932 and the short sale price, with perhaps adjustments for the dividends. The profit was realized in 1932. *Robert W. Bingham, supra; Charles H. Oshei, supra.* The petitioner originally contended that there were two taxable transactions; the gain from the short sale was the difference between the short sale price and the market value of the stock at the date the short sale was covered; the gain from the disposition of the long stock was the difference between the cost of that stock and the market value of the stock on the date the long stock was used to cover the short sale; and the first gain was taxable as ordinary income, while the latter gain was taxable as capital gain. The market value of the shares on March 22, 1932, has been stipulated. But the decedent did not buy or sell any shares at that price and, consequently, no such fictitious purchase and sale should be used to compute taxable gains in this case, since no impelling reason exists for adopting that unusual procedure. The petitioner in his brief made that contention as an alternative only and now contends that all of the gain was capital gain from the disposition of his shares held for more than two years.

There remains for consideration the question of whether Congress intended section 23 (s) to apply in all cases where gain or loss was realized from a short sale of stock or bonds or whether it intended the provision merely as a supplement to subsection (r). Counsel call attention to the caption of section 23, to the caption of subsection (s), and to the following language appearing in both Committee Reports:

Subsection (s) requires that gains or losses from short sales of stocks and bonds, or from privileges or options to buy such securities, shall be treated as gains or losses from the sale or exchange of stocks and bonds held for less than two years. Your committee is of the opinion that there should be no distinction between such transactions and other sales or exchanges of stocks and bonds. Accordingly, the limitation on stock losses is extended to this type of transactions.

See H. Rept. No. 708, p. 13, and S. Rept. No. 665, p. 19, 72nd Cong., 1st sess. They argue from the foregoing that Congress merely

intended to make sure that short sales would be treated as sales, rather than as any other kind of transactions, *for the purpose of limiting losses.* This argument is not without force. The caption of subsection (s), if it had been printed in full, would have been as follows: "Limitation on stock losses—short sales." The words of the caption "Limitation on stock losses" are obviously not well chosen, since the subsection deals with losses on both stocks and bonds. Yet this caption and the statement in the Committee Reports certainly tend to indicate that Congress intended subsection (s) as a mere supplement to subsection (r) so that the limitation provided in (r) would also extend to losses from short sales. Furthermore, there is no very apparent reason for a provision that all gains and losses from short sales of stocks and bonds shall be eliminated from the capital gain provisions. Yet, in this respect, it is like subsection (r), which limits deductions for losses on stocks and bonds held for less than two years but does not limit deductions for losses on other kinds of assets.

Congress has said in subsection (s), "For the purposes of this title" gains or losses from short sales of stock shall be considered as gains or losses from the sales or exchanges of stocks which are not capital assets. The words quoted are not ambiguous and should be given the effect which their use so clearly implies. They must mean for all purposes of "Title I—Income Tax." They stand in sharp contrast to words used elsewhere in section 23, where Congress intended a greater restriction upon the application of other subsections. For example, in subsection (c) Congress said: "For the purpose of this subsection." If subsection (s) were to be interpreted in the way the petitioner contends, the words "For the purposes of this title", which Congress actually used, would have to be read, "For the purposes of determining the limitations provided in subsection (r) of this section." Subsection (s) can not be limited in its application as the petitioner contends without doing violence to the text of the provision.

It is argued with some force that this produces a strange result. Perhaps it does. But results no less strange would result from the petitioner's interpretation. As he would interpret the provision, where a taxpayer had gains from short sales which were closed by the delivery of stock held for more than two years at the time of the sale, the gains would be subject to tax under section 101, whereas, if a taxpayer had gains of that kind and also losses from short sales of any kind, the gains, to the extent of the losses, would be taxed as ordinary income and the remaining gains would be taxed either as ordinary income or as capital gain. Thus the question is not solved by considering the results of the different interpretations.

A choice between the plain words of the text of the provision, on the one hand, and the caption and legislative history of the provision, on the other, must be made. Where words in the caption and body of a statutory provision differ in meaning, the latter will prevail. *Sugarland Industries* v. *Bass*, 36 Fed. (2d) 375; *Ware* v. *Hylton*, 3 Dallas, 199. The heading of a section may be considered as an aid to the interpretation of the text, when the text is ambiguous, but may not be used to limit or set at naught the plain meaning of the text. *Knowlton* v. *Moore*, 178 U. S. 41; *Patterson* v. *Bark Eudora*, 190 U. S. 169; *Strathearn S. S. Co.* v. *Dillon*, 252 U. S. 348; *Allen* v. *United States*, 47 Fed. (2d) 735. If the language were ambiguous the rule, that doubts are to be resolved in favor of the taxpayer, could not be applied since it can not be determined which interpretation would be most favorable to taxpayers generally. *Burnet* v. *Guggenheim*, 288 U. S. 280. The language of the text seems to be the safest guide in interpreting subsection (s). The provision, therefore, applies for all purposes of Title I. Gains or losses from short sales of stocks or bonds must be considered for all income tax purposes as gains or losses from sales or exchanges of stocks or bonds which are not capital assets. The gain in the present case was a gain from a short sale of stock and, therefore, is taxable as ordinary income and not as capital gain.

Reviewed by the Board.

*Decision will be entered for the respondent.*