HENRY F. duPONT, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 85519.   Promulgated December 7, 1938.

*William L. Hennessy, Esq.,* for the petitioner.

*James D. Head, Esq.,* and *Joseph D. Hughes, Esq.,* for the respondent.

# 1318

SMITH: The respondent has determined a deficiency of $204,148.59 in petitioner's income tax for the calendar year 1932. The allegations of error set forth in the petition are as follows:

(A) In determining the taxable net income of the petitioner for the year 1932, the Commissioner erroneously included as ordinary gain the profit on the sale of a block of 62,500 shares of duPont common stock which had been owned by the petitioner for more than two years and the profit realized upon the sale was reported by the petitioner in his income tax return as capital gain. The 62,500 shares of duPont common stock was acquired in 1915 and had a unit cost of $21.709 per share. The corrected cost is $1,356,812.38, sale price April 21, 1932, $1,999,250.00 capital gain $642,437.62.

(B) In determining the taxable net income of the petitioner for the year 1932, the Commissioner would not allow as a deduction from income $46,875.00 which represented a bookkeeping entry for "short dividends" charged to petitioner's brokerage account and supposed to represent a cash dividend paid by the duPont Company on June 15, 1932, on the 62,500 shares of stock sold and delivered on April 21, 1932.

(C) In determining the taxable net income of the petitioner for the year 1932, the Commissioner would not allow as a deduction from income as an ordinary and necessary expense short dividends in the amount of $52,237.50 paid by the petitioner on account of short sales made during 1932.

The facts have been stipulated in great detail and we adopt the written stipulation as our findings of fact.

The petitioner filed with the collector at Wilmington an income tax return for 1932 which showed capital gains and losses from the sale of shares of stock held two or more years as follows:

| Item | Description | Profit | Loss |
|------|-------------|--------|------|
| 1 | 15,000 shares duPont common | $413, 258. 42 | |
| 2 | 39,000 shares duPont common | 489, 235. 39 | |
| 3 | 8,700 shares duPont common | 84, 647. 05 | |
| 4 | 62,500 shares duPont common | 567, 794. 08 | |
| 5 | 40,000 shares General Motors | | $313, 121. 21 |
| 6 | 28,375 shares General Motors | | 456, 990. 39 |
| | Net profit | 1, 554, 935. 54 | 770, 111. 60 |
| | | 784, 823. 94 | |

He also reported in schedule C of the return a net loss of $263,990.20 from the sale of shares of stock taxable at ordinary rates.

Upon the audit of the return the respondent determined that the petitioner's profits and losses from the sale of shares of stock were all ordinary gains and losses and not capital gains and losses. The petitioner does not question the correctness of such determination except as it relates to the sale of 62,500 shares of duPont common stock. The petitioner contends that that profit was a capital gain.

Certain errors of computation made by the petitioner in the compilation of his income tax return have been corrected by the stipulation of facts filed in this case. From this stipulation the gain or loss

from the sale of shares of stock by the petitioner in 1932, without taking into account the question whether the gain or loss was a capital gain or a capital loss, was as follows:

| Item | Description | Profit | Loss |
|------|-------------|--------|------|
| 1 | 15,000 shares duPont common | $445,494.09 | |
| 2 | 39,000 shares duPont common | 573,031.51 | |
| 3 | 8,700 shares duPont common | 84,647.05 | |
| 4 | 3,100 shares duPont common | 10,720.30 | |
| 5 | 40,000 shares General Motors | | $48,378.82 |
| 6 | 28,375 shares General Motors | | 721,732.78 |
| 7 | 2,400 shares General Electric | 754.00 | |
| 8 | 10,000 shares General Electric | | 156,000.00 |
| 9 | 500 shares American Gas & Electric Co | 167.50 | |
| 10 | 5,100 shares American Gas & Electric Co | | 114,656.00 |
| 11 | 62,500 shares duPont common | 451,762.88 | |
| 12 | 2,400 shares duPont common | | 7,142.12 |
| 13 | 2,200 shares General Motors | | 5,080.10 |
| 14 | 300 shares General Motors | | 627.40 |
| 15 | 3,300 shares General Motors | 7,873.60 | |
| | Total | 1,574,450.93 | 1,053,617.22 |
| | Net gain | 520,833.71 | |

The sales of the shares of stock in items 1 to 12, inclusive, are shown by both the broker's and the petitioner's books of account as having been short sales. The gains and losses from the sales shown in items 13, 14, and 15 were from sales of long stock held for a period of less than two years. The short sales shown by items 4, 7, and 9 were covered by purchases during 1932. At the time when the short sales were made, represented by items 1 to 11, inclusive, the petitioner had, in long accounts with the same broker who made the short sales, equivalent amounts of shares of long stock. All of the outstanding short accounts were closed out upon instructions from the petitioner not later than October 19, 1932, by transfers to the short accounts from the long accounts. In most cases the shares thus transferred from the long accounts had been owned by the petitioner for a period of more than two years at the date of transfer.

In the above tabulation the gain or loss has been determined by adding to the cost base (proceeds from the short sales) short dividends charged against the petitioner while the short contracts were outstanding. The short dividends added were as follows:

| Item | Description | Short dividends |
|------|-------------|-----------------|
| 2 | 39,000 shares duPont common | $29,250.00 |
| 3 | 8,700 shares duPont common | 6,525.00 |
| 6 | 28,375 shares General Motors | 14,187.50 |
| 8 | 10,000 shares General Electric | 1,000.00 |
| 10 | 5,100 shares American Gas & Electric Co | 1,275.00 |
| 11 | 62,500 shares duPont common | 46,875.00 |
| | Total | 99,112.50 |

In this proceeding the petitioner contests, so far as the question of capital gain or ordinary gain is involved, only the respondent's

determination that the gain on the sale of 62,500 shares of duPont common stock (item 11) was ordinary gain. He contends that that gain was capital gain.

The petitioner is a resident of Winterthur, Delaware.

During 1932 the petitioner was not engaged in the trade or business of buying and selling securities. He was not a member of or connected with any stock exchange or brokerage firm. He was, however, a holder of substantial blocks of stock of the duPont Co., General Motors Corporation, and other corporations. He purchased and sold large quantities of stock during 1932. He had offices in the duPont Building at Wilmington. J. F. Otwell, his secretary, was in charge of the office.

Raymond W. Ellis for a number of years prior to 1932, and during all of the period from January 1 to September 30, 1932, was an employee of Laird, Bissell & Meeds, a firm of stock brokers and members of the New York Stock Exchange, with offices located in the duPont Building at Wilmington and also in New York City. During all of the period from January 1 to September 30, 1932, Ellis was employed as a customers' man by Laird, Bissell & Meeds. He had a clientele of his own and maintained an office separate and apart from that of Laird, Bissell & Meeds but located in the same building.

The petitioner was accustomed during the year 1932 and for several years prior thereto to rely upon the advice of Ellis as to all matters concerning the purchase and sale of securities. Neither the petitioner nor his secretary, Otwell, was familiar with the provisions of the Federal income tax laws, but Ellis was considered an expert in that field. It was petitioner's custom in buying and selling securities either personally or through Otwell to advise Ellis of the transactions he wished to make. Petitioner was not accustomed to instruct Ellis as to the manner in which purchases or sales should be made, nor as to which one of his accounts purchases or sales should be made for, but relied upon Ellis to handle such transactions in whatever way would be most advantageous to petitioner from the standpoint of income taxes or other taxes. In consideration of Ellis' services in this connection petitioner placed all of his orders for the purchase and sale of securities during the year 1932 through Ellis and paid Ellis a yearly fee of $1,000 for such services. The petitioner's Federal income tax return for 1932 was prepared for the petitioner by Ellis and the petitioner verified the return before Ellis as a notary public of the State of Delaware. Ellis died on March 24, 1933.

The petitioner maintained five accounts during the calendar year 1932 with the Wilmington office of his brokers, Laird, Bissell & Meeds. These accounts were designated respectively "H. F. duPont"

(sometimes referred to hereinafter as the "regular" account), "H. F. duPont Special", "H. F. duPont Short", "H. F. duPont Short No. 2", and "H. F. duPont Special Short."

Orders for all of the above listed sales of stocks in 1932 (with the exception of the 62,500 shares of duPont common stock) were placed with the Wilmington office of Laird, Bissell & Meeds by Ellis pursuant to oral instructions from the petitioner and then sent by telephone to Laird, Bissell & Meeds' New York office, and the sales were made by the brokers on the floor of the New York Stock Exchange in the ordinary course of business. Deliveries to purchasers were made on the following full business day out of shares belonging to Laird, Bissell & Meeds or their customers, or from shares borrowed by them from other brokers. The proceeds of the sales were credited to petitioner's respective accounts as directed by Ellis. Any dividends declared on shares sold short between the date of the sale and the closing date were debited to the short accounts.

As of April 1, 1932, the petitioner was indebted to the Bankers Trust Co. of New York in the amount of $4,000,000. The indebtedness was secured by collateral which included 90,000 shares of the common stock of the duPont Co. The Bankers Trust Co. requested the petitioner to deposit additional collateral or else to reduce the indebtedness. The Bankers Trust Co. was willing to release 62,500 shares of the duPont stock upon the payment to it of $2,000,000. The petitioner contracted to sell to the Christiana Securities Co. 62,500 shares of duPont common stock at that price. The Christiana Securities Co. made an arrangement with J. P. Morgan & Co. of New York to lend it $2,000,000 upon the security of 62,500 shares of duPont stock.

On or about April 20, 1932, the petitioner advised Ellis of the arrangements which he had made with the Bankers Trust Co. and the Christiana Securities Co. and requested Ellis "to handle the matter" for petitioner through Laird, Bissell & Meeds. On the same day Ellis wrote and transmitted to the New York office of Laird, Bissell & Meeds a memorandum of instructions reading as follows:

April 20, 1932.

MEMORANDUM To: Mr. John Ross
     FROM: R. W. Ellis

You are to pay to the Bankers Trust Company two million dollars ($2,000,-000), receiving sixty two thousand five hundred (62,500) shares duPont Common in the name of H. F. duPont. You are to place in the name of Laird, Bissell & Meeds the sixty two thousand five hundred (62,500) shares duPont Common.

We will make delivery in Wilmington of sixty two thousand five hundred (62,500) shares duPont Common, preferably in stock other than certificates which you receive from the Bankers Trust Company. In fact, to eliminate any possible chance of being taxed on the sale, we must see to it that none of the Bankers Trust certificates are used in making this delivery.

[Signed] R. W. ELLIS

On April 21, 1932, Ellis, in his own handwriting and using the form of buy and sell orders used by Laird, Bissell & Meeds for investment purchases and sales for its own account (as distinguished from the form of buy and sell orders for the accounts of customers), made out a buy order showing that Laird, Bissell & Meeds purchased 62,500 shares of duPont Co. common stock for $2,000,000 from "H. F. duPont Short No. 2" account, and a sell order showing that Laird, Bissell & Meeds sold for $2,000,000 to the Christiana Securities Co. 62,500 shares of duPont Co. common stock.

Upon receipt of the memorandum of instructions from Ellis, the New York office of Laird, Bissell & Meeds received from the Bankers Trust Co. through the Stock Clearing Corporation 62,500 shares of common stock of the duPont Co. The certificates were all registered in the name of the petitioner and were accompanied by blank powers of attorney for transfer properly endorsed by the petitioner. At the same time the Bankers Trust Co. billed Laird, Bissell & Meeds through the Stock Clearing Corporation for $2,000,000 against this delivery of 62,500 shares of the common stock of the duPont Co. and payment was made by Laird, Bissell & Meeds to the Bankers Trust Co. through the Stock Clearing Corporation in their daily settlement check (which check represents the net difference between their purchases or items received for payment through the Stock Clearing House). The certificates which Laird, Bissell & Meeds received from the Bankers Trust Co. were delivered to the transfer agent of the duPont Co. on April 21, 1932, and new stock certificates were received by Laird, Bissell & Meeds from the transfer agent the same day, all in the name of Laird, Bissell & Meeds.

On the same day, namely, April 21, 1932, Laird, Bissell & Meeds delivered to J. P. Morgan & Co. stock certificates for 62,500 shares of the common stock of the duPont Co. and received from J. P. Morgan & Co. a check drawn to the order of Laird, Bissell & Meeds in the amount of $2,000,000, which check was deposited to the credit of Laird, Bissell & Meeds in the Guaranty Trust Co. Of the stock certificates delivered by Laird, Bissell & Meeds to J. P. Morgan & Co. on April 21, 1932, certificates representing 40,500 shares of the common stock of the duPont Co. were part of the certificates previously on the same day issued in the name of Laird, Bissell & Meeds by the transfer agent of the duPont Co. The remaining certificates, representing 22,000 shares of the common stock of the duPont Co. were either in the name of Laird, Bissell & Meeds or in street names but were not out of the series which Laird, Bissell & Meeds had on the same day received from the transfer agent.

The accounting records of Laird, Bissell & Meeds show 62,500 shares of duPont Co. common stock received from the New York

office for the "H. F. duPont Special" account (a long account) at a charge of $2,000,000. They also show 62,500 shares of the duPont stock delivered to the New York office for the Christiana Securities Co. acount at a charge of $2,000,000.

On April 21, 1932, Laird, Bissell & Meeds delivered confirmation notices to the petitioner notifying him that his "H. F. duPont Short No. 2" account was credited in the sum of $1,999,250 as the proceeds of the sale of 62,500 shares of duPont Co. common stock, and that his "H. F. duPont Special" account was charged in the sum of $2,000,000 against receipt of 62,500 shares of the same stock. Upon receipt of these confirmation notices entries were made on petitioner's books in accordance therewith as shown in petitioner's ledger accounts entitled "Laird Bissell and Meeds—H. F. duPont Short Account #2" and "Laird Bissell and Meeds—H. F. duPont Special Account."

The investment ledger of Laird, Bissell & Meeds reflects purchases and sales by Laird, Bissell & Meeds for its own account as principal. On April 21, 1932, an entry was made in the Laird, Bissell & Meeds investment ledger account entitled "E. I. duPont de Nemours & Co. Common Stock", showing a purchase on that date from "H. F. duPont Short No. 2" account of 62,500 shares for $2,000,000 and a sale on that date to the Christiana Securities Co. of 62,500 shares at a price of $2,000,000. The sale by petitioner of 62,500 shares of duPont Co. common stock is recorded in the ledger account entitled "H. F. duPont Short No. 2" under date of April 22, 1932. The receipt of 62,500 shares is recorded in the account entitled "H. F. duPont Special" under date of April 21, 1932.

On August 19, 1932, petitioner through Ellis instructed his brokers, Laird, Bissell & Meeds, to transfer the entire balance of 62,500 shares of common stock of the duPont Co. in his "H. F. duPont Special" account to his "H. F. duPont" or "regular" account. These instructions were executed by the brokers on the same day. Likewise, on August 19, 1932, petitioner through Ellis instructed his brokers, Laird, Bissell & Meeds, to transfer to his "H. F. duPont Short No. 2" account, to be applied against the sale in that account on April 21, 1932, of 62,500 shares of common stock of the duPont Co. as shown in the preceding paragraph, 62,500 shares of the common stock of the duPont Co. in his "H. F. duPont" or "regular" account. These instructions were executed by the brokers on the same day and the sale of 62,500 shares of common stock of the duPont Co. in the "H. F. duPont Short No. 2" account, as shown in the preceding paragraph, was closed by such transaction.

A dividend at the rate of 75 cents a share was declared on the duPont Co. common stock, payable June 15, 1932, to stockholders of record of May 25, 1932. On June 15, 1932, Laird, Bissell & Meeds

charged the "H. F. duPont Short No. 2" account in the sum of $46,875 representing an amount equal to the dividend paid June 15, 1932, on 62,500 shares of duPont Co. common stock. On the same day Laird, Bissell & Meeds credited the "H. F. duPont Special" account in the sum of $46,875 representing June 15, 1932, dividends on 62,500 shares of duPont Co. common stock. The sum of $46,875 shown in this account under date of June 15, 1932, as dividends on 62,500 shares of duPont Co. common stock was included in the total sum of $573,977.95 reported by the petitioner in his Federal income tax return for the year 1932 as "dividends on stock of domestic corporations."

The rule of the New York Stock Exchange in force during all of the year 1932 in respect to margin requirements is contained in chapter XII, section 1, of the rules of the New York Stock Exchange, and reads as follows:

SEC. 1. The acceptance and carrying of an account for a customer, whether a member or a non-member, without proper and adequate margin, may constitute an act detrimental to the interest or welfare of the Exchange.

For the purpose of computing the margin for carrying the accounts of the petitioner during the year 1932, his brokers, Laird, Bissell & Meeds, considered his "H. F. duPont" or "regular" account, "H. F. duPont Short", "H. F. duPont Special", "H. F. duPont Short No. 2", and "H. F. duPont Special Short" as one consolidated account.

Chapter VII, section 10, of the rules of the New York Stock Exchange which were in force during all of the year 1932 reads as follows:

SEC. 10. An allowance for interest on short sales of stock shall not be more than the loan market rates for the stocks borrowed or used for such short sales.

On April 8, 1932, the committee on business conduct of the New York Stock Exchange promulgated a rule covering reports on overnight short positions which reads in material part as follows:

TO MEMBERS OF THE EXCHANGE:

As of the close of business April 9, 1932, the Committee on Business Conduct rescinds all circular letters on the subject of reports on overnight short positions, and in lieu thereof directs that members report the short position, including odd lots, in each stock, for each account or customer, giving the name of the owner of the account, as of the close of business every clearing day commencing April 8, 1932.

Do not include as short positions the following:

(1) Sales for "Cash" with stocks not yet received from the seller.

(2) Sales or "short" positions against "long" positions in the same stocks where definite instructions have been given to deliver other certificates.

(3) Sales or "short" positions where it is actually known, without further inquiry, that the seller has the same long stocks in his possession or has an offsetting position against his short sales in the same stocks.

During all of the year 1932 Laird, Bissell & Meeds maintained daily records showing the long and short positions of its customers. These records consisted of large sheets of paper, one side of which was designated with the name of the stock involved and the word "long" and the other side was captioned with the name of the stock and the word "short." The names of the customers were listed alphabetically on each side of these sheets with the number of shares long or short at the close of the business day covered by each sheet. The petitioner and the respondent are agreed that all of the sales listed in items 1 to 11, inclusive, of the complete tabulation of sales of stock by the petitioner in 1932, including the sale of the 62,500 shares of common stock of the duPont Co. shown in the "H. F. duPont Short No. 2" account, were listed on the long and short position record of Laird, Bissell & Meeds as short sales, and that each of such entries bears the penciled word "offset", which was intended to show that the petitioner had long positions equal to or in excess of his short positions on the days in question. The parties are further agreed that neither the sale of the 62,500 shares of common stock of the duPont Co. nor any of the transactions listed in the above referred to items 1 to 11, inclusive, were reported by Laird, Bissell & Meeds to the New York Stock Exchange in its reports of overnight short positions required under the rule of the committee on business conduct promulgated April 8, 1932.

Upon this background of the stipulated facts the petitioner contends that there was no short sale of the 62,500 shares of duPont Co. common stock in April 1932 and that the transaction does not come within the provisions of section 23 (s) of the Revenue Act of 1932, which provides in material part as follows:

SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\*       \*       \*       \*       \*       \*       \*

(s) SAME—SHORT SALES.—For the purposes of this title, gains or losses (A) from short sales of stocks and bonds, or (B) attributable to privileges or options to buy or sell such stocks and bonds, or (C) from sales or exchanges of such privileges or options, shall be considered as gains or losses from sales or exchanges of stocks or bonds which are not capital assets.

The petitioner contends that the profit realized from the sale of the 62,500 shares was from the sale of shares of stock owned by him for a period of more than two years and that he is entitled to be taxed thereon at capital gain rates.

The essential facts bearing upon this point are that in April 1932 the petitioner was carrying in a long account with his brokers, Laird, Bissell & Meeds, more than 62,500 shares of duPont common stock. He was also the owner of 90,000 shares of duPont common stock which were deposited as collateral with the Bankers Trust Co. of

New York. The Bankers Trust Co. agreed with the petitioner to release 62,500 shares of the duPont common stock upon the payment of $2,000,000. The petitioner contracted to sell to the Christiana Securities Co. 62,500 shares of duPont common stock for $2,000,000. The petitioner informed Ellis, his agent, and also an employee of Laird, Bissell & Meeds, to "handle the matter." Ellis handled the matter after this fashion: He made a short sale for the petitioner of 62,500 shares of duPont common stock, the purchaser of the shares being Laird, Bissell & Meeds. On the same day, Laird, Bissell & Meeds acquired from the Bankers Trust Co. 62,500 shares of duPont common stock, paying therefor $2,000,000. Although these shares were immediately transferred to the name of the brokers, they were credited to the "H. F. duPont Special" account, which was a long account and the petitioner was charged $2,000,000 therefor. On the same day, Laird, Bissell & Meeds, as principal, sold 62,500 shares of duPont common stock to the Christiana Securities Co., delivering them to J. P. Morgan & Co. and receiving $2,000,000 therefor. All of the above transactions took place on April 21, 1932. At the close of the day the petitioner was shown by the broker's books of account as being "short" 62,500 shares duPont Co. common stock and "long" an equal amount of stock representing the shares acquired from the Bankers Trust Co. The petitioner was informed of the "short" sale and of the purchase of long stock made by the brokers for him. He knew that the brokers had charged him with a short sale of the 62,500 shares and that his long account was augmented by an equal number of shares.

Counsel for the petitioner submits that the attempt of Ellis to set up long and short positions in respect of the sale and acquisition of the 62,500 shares of stock in question was "uncalled for, unnecessary and to say the least, very unethical." These are questions which we are not required to pass upon. The facts do not show that the acts of Ellis and of the brokers were not within the authority granted by the petitioner and that their records of the transactions are not genuine and correct.

The Board in several recent cases has had occasion to pass upon the question whether sales made under circumstances somewhat similar to those obtaining in the instant case were "short" sales within the meaning of the quoted provisions of the statute. A thorough exposition of the question, particularly with reference to the factors which distinguish short sales from ordinary sales, is found in *Frances Bartow Farr, Executrix*, 33 B. T. A. 557. We held in that case that, where a taxpayer made several sales of shares of stock through a broker during 1931, the sales being treated as short sales, and the sales were covered in 1932 by the transfer of shares of the same stock

which the taxpayer had held for more than two years, the sales were short sales within the meaning of the statute and the gains thereon were taxable in 1932 as ordinary gains. In our opinion in that case we said:

Thus, a short sale may be made, not only by one who does not own any securities of the kind which he sells, but also by one who actually owns securities of the kind he sells. Short sales must frequently be made by brokers who are not informed whether or not their principal is the owner of shares which he could sell and deliver if he so desired. One of the chief differences between a regular sale and a "short sale" is that, in the former, the seller delivers his own shares to the purchaser and thus closes the transaction, while in the latter, he delivers "borrowed" shares and the transaction is not closed so far as the seller is concerned until he delivers shares to repay the "loan." If the shares sold are not furnished by the seller at the time of the sale but are supplied by the broker, the transaction is a short sale and sets in motion the short sale process. * * *

Petitioner cites *C. R. Dashiell*, 36 B. T. A. 313, in support of his contentions in this proceeding that the petitioner made no short sale of his 62,500 shares of duPont Co. common stock on April 21, 1932. There, the taxpayer while visiting in Florida instructed his broker in Chicago to sell certain specified shares of stock represented by certificates held in his safe deposit box in Chicago. The sale was actually made on the following day through another broker in New York, with delivery of borrowed shares. On the same day the Chicago broker credited the proceeds of the sale to the taxpayer and charged him with the shares sold. About a month later the taxpayer on his return to Chicago obtained the certificates from his safe deposit box and delivered them to his broker, as he had previously agreed to do. We held, contrary to the Commissioner's determination, that the sale of the shares in question was a cash sale and not a short sale. It was conceded that the facts in the *Dashiell* case were similar to those in *Dee Furey Mott*, 35 B. T. A. 195, where a like result was reached. In that case we said:

* * * "A short sale is a contract for the sale of shares which the seller does not own or the certificates for which are not within his control so as to be available for delivery at the time when, under the rules of the Exchange, delivery must be made." *Provost* v. *United States*, 269 U. S. 443. Here the petitioner owned the shares and they were within her control and available for delivery. She intended to sell the shares that she owned, and it is stipulated that they were sold. Mere failure to deliver certificates is not alone enough to establish a short sale. *C. B. Ferree*, 32 B. T. A. 725; affd., 84 Fed. (2d) 124. Accordingly, it is held that the sales of Westinghouse and United States Steel shares were not short sales.

*C. B. Ferree*, 32 B. T. A. 725; affd., 84 Fed. (2d) 124, involved similar facts. There, the taxpayer instructed his broker to sell for him 800 shares of Continental Can Co. stock, the certificates for which

were in his safe deposit box. The broker sold 800 shares of the stock for taxpayer's account and later received certificates for 800 shares out of lots of the same stock which he had purchased for the taxpayer. In our opinion we said:

* * * But the evidence shows that the petitioner intended to sell the 800 shares which he owned, that he instructed the broker to sell such shares, and, in view of the fact that the broker promptly sold 800 shares, the conclusion is inescapable that the broker was carrying out the instructions and sold the shares he was directed to sell. There is not the slightest reason to believe that either the petitioner or the broker was considering a short sale, and the mere failure of petitioner to deliver the certificates is not alone sufficient to establish one.

In all of the above cases where it was held that the sales were not short sales the evidence showed that at the time of the transaction the taxpayer had a clear intention to sell the specific shares which he then held, and so instructed his broker. No such facts obtain in the proceeding at bar. The petitioner did not instruct Ellis as to how the transactions should be carried out. The general authority under which Ellis acted warranted him in making a short sale of the 62,500 shares of duPont Co. common stock if he desired to do so. He certainly made what he considered was a valid short sale. We think it was. In *duPont* v. *Commissioner* (C. C. A., 3d Cir.), 98 Fed. (2d) 459, the court stated:

James Edward Meeker, Economist to the New York Stock Exchange, states in his book "Short Selling," "A short sale may be briefly but comprehensively defined as a sale which creates a debt in terms of goods." * * *

Judged by this definition, the brokers made a short sale on April 21, 1932, of 62,500 shares of duPont Co. common stock for the account of the petitioner. The effect of the transaction reflected on the broker's books under date of April 21, 1932, in "H. F. duPont Short No. 2" account was to create "a debt in terms of goods" owing by the petitioner to the brokers. We do not think that it can be doubted that, if the petitioner had in August 1932 instructed his brokers to close his short account by a covering purchase of 62,500 shares of duPont common stock and the purchase had been made, the gain or loss upon the transaction reflected in the short account would be the difference between the proceeds from the short sale and the cost of the covering purchase. Compare *Helvering* v. *Rankin*, 295 U. S. 123, in which it was held that the "first in, first out" rule was inapplicable in determining taxable gain on the sale of corporate stock purchased on margin where the margin trader had through his broker designated the securities to be sold as those purchased on a particular date and at a particular price. The intention of the customer as shown by instructions to his broker either personally or through an agent is to be given effect.

The petitioner in his brief makes an extended argument that, since under the rules of the New York Stock Exchange long accounts and short accounts with a broker may be consolidated for the purpose of determining margins, the long and short accounts are likewise to be consolidated for the purpose of determining whether a short sale has been made. In short, the argument is that a man can not make a short sale of shares of stock through a broker who is carrying for him long stock of an equivalent amount. This was the point in issue in *duPont* v. *Commissioner*, *supra*. The court held that a person might sell shares short through a broker who was carrying an equivalent amount of long stock for the customer and that, where the short contract was closed by a transfer from the long account to the short account of shares of stock which had been owned by the customer for a period of more than two years, the gain was, under the same provision of the statute as is involved herein, an ordinary gain and not a capital gain.

Upon the authority of *duPont* v. *Commissioner*, *supra*, we sustain the respondent's contention that the profit realized by the petitioner from the sale of the 62,500 shares of duPont Co. common stock was not from the sale of capital assets within the meaning of the taxing statute.

The remaining question for our consideration is whether the short dividends charged against the petitioner and treated by him and by the respondent in the determination of the deficiency as additions to the cost basis of the shares sold were properly so treated or should be regarded as ordinary and necessary expenses deductible from gross income. The evidence shows that the petitioner was not a broker nor engaged in a business of buying and selling securities. The decision of the Board in *Gladys G. Terbell et al., Executors*, 29 B. T. A. 44; affd., 71 Fed. (2d) 1017, is dispositive of the issue and confirms the treatment of the short dividends made both by the petitioner in his return and the respondent in the determination of the deficiency.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

---

ARUNDELL, dissenting: The majority holding of a short sale is based on the negative proposition that the facts do not show that the acts of Ellis and the brokers were not within the authority granted by the petitioner and that their records are not genuine and correct. Stated otherwise, the holding is predicated on a presumption of authority in Ellis and the brokerage firm to act as principal and of

entries in accordance with such authority. Against this is the presumption that the brokers were acting as agents. A broker in securities to whom an order to buy or sell is entrusted may not, without the full knowledge and consent of his customer, sell to or buy from himself. Meyer, Law of Stockbrokers and Stock Exchanges, § 51 and cases cited therein. The rules of New York Stock Exchange, with limited exceptions that do not apply here, prohibit a member while acting as a broker from buying or selling for his own account securities for which he or his firm has accepted an order to buy or sell. Ch. XI of the rules of the stock exchange. The effect of the holding in this case is to say that the brokerage firm violated the rules of the exchange, and this I think we should hesitate to do without clear evidence of the fact.

I realize fully that a short sale may be made by one who actually owns securities of the kind he sells. *Francis Bartow Farr, Executrix*, 33 B. T. A. 557, 561. But a sale of the same kind of securities is not the same as a sale of the *specific* securities. The latter is a long sale, even though delivery of the certificates is temporarily delayed. *Dee Furey Mott*, 35 B. T. A. 195; *Ruml* v. *Commissioner*, 83 Fed. (2d) 257. Here, as I understand the facts, the petitioner owned 90,000 shares of duPont stock, the certificates for which were held by a bank as security for a loan. The petitioner contracted to sell 62,500 of those shares to the Christiana Securities Co. for cash.

The course of dealings establishes quite clearly that the shares in the hands of the bank, and not some other shares, were the subject of the contract to sell. The bank was demanding either additional collateral or a reduction of the loan, and petitioner arranged to take up 62,500 shares from the bank upon payment of $2,000,000 which he was to receive from the Christiana Securities Co. He did not arrange with the Christiana Securities Co. to sell it other duPont shares, nor did he contract with any one else to sell the shares held by the bank. It seems to me that this is the only possible conclusion on the facts given in the majority opinion; indeed the majority opinion does not hold otherwise. When petitioner had made the contract his agent carried it out by delivering duPont stock and collecting the sale price agreed upon between the seller and the buyer. This, it seems to me, was an ordinary sale within the rules of the *Mott* case, *supra*, and its character was not changed by reason of book entries made by the agent. It is not without significance that all of the transactions within the taxable year shown on the books of Laird, Bissell & Meeds as short sales, except the one here in question, were actually put through as short sales on the floor of the Stock Exchange in the ordinary course of business. This difference in procedure indicates that no short sale was made or intended in

connection with the shares purchased by the Christiana Securities Co. and leads to the conclusion that the brokers had no intention of buying any stock on their own account, but merely effected delivery to the Christiana Securities Co. of stock sold to that company by the petitioner. Intent to pass title is one of the governing factors in question concerning sales of specific goods. *Dee Furey Mott, supra.* Petitioner intended and contracted to sell his specific shares to the Christiana Securities Co. I think the majority opinion errs in disregarding the agreement of sale between the petitioner and the Christiana Securities Co. and in putting the decision on the records of the agent.

TURNER and ARNOLD agree with this dissent.