*Decision will be entered under Rule 50.*

WALTER E. HENDRICKS AND DEMA P. HENDRICKS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 149–67.    Filed November 12, 1968.

*Eric R. Fox* and *John C. Reid*, for petitioners.
*J. Randall Groves*, for respondent.

ATKINS, *Judge:* The respondent determined a deficiency in income tax for the taxable year 1963 in the amount of $246,089.75. Certain issues having been disposed of by agreement of the parties, the only issue remaining for decision is whether short-term capital losses in the amount of $967,760.60 resulting from short sales of securities in the stock market are properly deductible for the taxable year 1963.

#### FINDINGS OF FACT

Some of the facts were stipulated and are incorporated herein by this reference.

The petitioners are husband and wife whose residence at the time of filing the petition was in Gastonia, N.C. They filed a joint Federal

income tax return for the taxable year 1963 with the district director of internal revenue in Greensboro, N.C. They filed their income tax returns on the cash method of accounting and on the calendar year basis.

Each of the petitioners maintained during the taxable year 1963 a large securities trading account with Bache & Co. (hereinafter referred to as Bache), which was a member of the American Stock Exchange, and consummated a large number of trading transactions in that year. On various dates, commencing on May 29 and terminating on October 10, 1963, the petitioners sold short 3,900 shares of common stock of Syntex Corp. (referred to hereinafter as Syntex) for net receipts in the amount of $516,142.82. In November 1963, the common stock of Syntex was split 3 for 1, leaving the petitioners with a short position of 11,700 shares. The common stock of Syntex was listed and traded on the American Stock Exchange. All the petitioners' transactions in Syntex stock during 1963 were with the Bache office in Charlotte, N.C. During 1963, the petitioners did not own any Syntex stock prior to December 27.

Pursuant to its regulation T, the Federal Reserve Board sets margin requirements which require that an individual selling stock short must pay to the broker a minimum amount of cash or deliver to the broker a minimum amount of listed securities the loan value of which is equal to the required cash. At all times material herein the margin requirement set by the Federal Reserve Board was 70 percent and the loan value of a listed security was 30 percent of its fair market value. Thus, for every $100 of stock sold short an investor was required to pay his broker $70 or deliver to the broker $233.33 worth of listed securities. Alternatively a combination of cash and securities could be turned over to the broker provided that in the case of securities the 30-percent regulation T formula was applied. The regulation T margin requirement applies only to the value of the stock at the time the short sale takes place; no further margin is required under such regulation, notwithstanding any rise in the price of the stock sold short.

To protect itself against possible loss in the event of a price rise, a stockbrokerage house has its own margin requirements called minimum maintenance requirements. Stock exchange rules dictate that the minimum maintenance requirement must be at least 30 percent of the value at any time of the stock held short. Thus, unlike the regulation T margin payment which is a one-time occurrence, the dollar amount of the minimum maintenance requirement will increase if the price of the stock held short increases. Each individual broker varies the minimum maintenance requirement between 30 percent and 100 percent depending on its views of current activity in the stock held short. Bache normally requires a 30-percent minimum maintenance margin on short

sales transactions. At all times relevant the regulation T margin requirement and the minimum maintenance requirement were the same for both long and short sales. The settlement date was also the same for both. Such date, which is the date by which the customer must make any required delivery of cash, securities, or margin to the broker, is the fourth business day following the purchase or sale (trade date). A client of a brokerage firm may be both long and short in the same stock at the same time.

Bache maintains two types of accounts for its customers to reflect short transactions and margin payments—the type 2 margin account and the type 3 short account. A customer's margin payments are reflected in his type 2 account. When Bache sells stock short for a customer it credits the proceeds of the sale to his type 3 account and at the same time the type 3 account reflects that the stock is sold short.

It is the purpose of the minimum maintenance requirements to make certain that the broker has sufficient cash or stock of its customer at any time to purchase enough stock to cover the customer's short position and still have, as a safety factor, cash or stock of the customer in an amount equal to 30 percent of the then value of the stock. As the value of the stock sold short rises, the broker transfers margin from the type 2 to the type 3 account so that the credit in the type 3 account is always equal to the value of the stock held short. If the transfer of margin from the type 2 account brings the safety factor or margin below 30 percent, the broker issues a margin call to bring the margin back up to 30 percent. If the margin call is not met, the broker will take it upon itself to cover the customer's short position by making the necessary purchases, notwithstanding the fact that there is still sufficient collateral in the customer's account to pay for all losses. Bache, on its own initiative, would purchase only enough stock to meet the margin call. It would not, without instructions from the client, proceed to fully close out the short position unless necessary to meet the margin call.

Due to a continued rise in the price of Syntex stock the petitioners' respective type 2 account equities (i.e., the amount by which the value of the cash and securities delivered to Bache exceeded the petitioners' potential loss) fell below minimum maintenance requirements on December 26, 1963, and Bache issued a call for additional margin in the total amount of $380,000 ($240,000 in the case of the husband and $140,000 in the case of the wife). The petitioners were unable to post any additional margin, and on December 27, 1963, Bache commenced to purchase the required number of shares of Syntex to satisfy its margin call. The petitioners instructed Bache to cover their entire short position in Syntex by buying 11,700 shares of such stock. On December 27 and 30, 1963, shares totaling 5,300 and 1,900, respectively,

were purchased for the husband and on such dates shares totaling 2,200 and 2,300, respectively, were purchased for the wife.

The cost of purchasing the 11,700 shares of Syntex stock was $1,483,803.42, and such cost was irrevocably fixed by December 31, 1963. Although minimum stock exchange requirements were not met, petitioners had enough equity in their type 2 accounts in cash and securities to fully cover the purchase price of the 11,700 shares, and therefore they were not required to pay any additional cash or deliver any further securities to Bache to pay for their purchases of the Syntex stock. This equity had been delivered to Bache prior to December 31, 1963. It was necessary to liquidate some of the securities held as margin in the petitioners' type 2 accounts in order to pay for the Syntex stock purchased. At no time in 1963 or 1964 could petitioners have withdrawn any of the cash or securities held by Bache as margin for the short position.

The settlement dates for the December 27 and 30, 1963, purchases of Syntex stock were January 3 and January 6, 1964, respectively, 4 business days after each trade as prescribed by standard brokerage rules. The stock certificates which Bache purchased on December 27 and 30, 1963, did not, according to the stock exchange rules, have to be delivered by the seller (an unrelated third party) to Bache until the settlement dates of January 3 and 6, 1964. On those dates Bache took delivery of the certificates and made payment for the purchased stock.

Upon the settlement dates for the above purchases of the 11,700 shares the shares delivered to Bache were not placed in the name of the petitioners. Bache immediately put those shares in its own name in order to make delivery thereof to the party from whom the necessary stock had been borrowed for delivery at the time of the original short sales.[1]

In their joint return for the taxable year 1963, the petitioners, in reporting taxable capital gain, took into account short-term capital losses totaling $967,650.60 on account of the short sales in Syntex stock.

In the notice of deficiency the respondent, in determining the petitioners' taxable capital gain, determined that the above short-term capital losses should not be taken into account for the taxable year 1963, but, rather, should be taken into account for the following year.

#### OPINION

The respondent, in determining that the losses sustained by the petitioners resulting from the short sales of Syntex stock were not

---

[1] The record does not disclose from whom the stock had been borrowed to make delivery to the purchasers at the times of the short sales made from May 29 to Oct. 10, 1963. Bache customarily borrows stock for this purpose from customer margin accounts, provided the necessary stock is available in such accounts. If not available from this source Bache borrows the necessary stock from another broker, and deposits with such broker the market value thereof.

sustained in the taxable year 1963 when the stock was purchased to close the short-sale transactions, but rather were sustained in the taxable year 1964 when the stock was delivered, relied upon section 1233 of the Internal Revenue Code of 1954,[2] and the regulations promulgated thereunder.[3]

The petitioners contend that in 1963 the losses on their short-sale transactions in Syntex stock became fixed and ascertainable since the net proceeds from the short sales as well as the cost of the stock purchased to cover their short position were determined in that year. They point out that although in 1963 the amount of cash and securities which they had delivered to Bache was insufficient to meet the 30-percent minimum maintenance requirements, such amount was sufficient to meet the purchase price of the stock bought for the purpose of covering, and that hence they were not required to furnish Bache any additional cash or securities to pay for such stock. They therefore contend that all payments representing the losses had been made to their stockbroker in 1963. They further claim that from and after the close of business on December 30, 1963, it was impossible for them to have prevented the closing out of their short position. They state that under no circumstances, irrespective of how much cash they might

---

[2] Sec. 1233 of the Code provides in part as follows:

(a) CAPITAL ASSETS.—For purposes of this subtitle, gain or loss from the short sale of property shall be considered as gain or loss from the sale or exchange of a capital asset to the extent that the property, including a commodity future, used to close the short sale constitutes a capital asset in the hands of the taxpayer.

(b) SHORT-TERM GAINS AND HOLDING PERIODS.—If gain or loss from a short sale is considered as gain or loss from the sale or exchange of a capital asset under subsection (a) and if on the date of such short sale substantially identical property has been held by the taxpayer for not more than 6 months (determined without regard to the effect, under paragraph (2) of this subsection, of such short sale on the holding period), or if substantially identical property is acquired by the taxpayer after such short sale and on or before the date of the closing thereof—

(1) any gain on the closing of such short sale shall be considered as a gain on the sale or exchange of a capital asset held for not more than 6 months (notwithstanding the period of time any property used to close such short sale has been held) ; and

(2) the holding period of such substantially identical property shall be considered to begin (notwithstanding section 1223, relating to the holding period of property) on the date of the closing of the short sale, or on the date of a sale, gift, or other disposition of such property, whichever date occurs first. * * *

[3] Sec. 1.1233–1(a) of the Income Tax Regulations provides in part as follows:

(1) For income tax purposes a short sale is not deemed to be consummated until delivery of property to close the short sale. Whether the recognized gain or loss from a short sale is capital gain or loss or ordinary gain or loss depends upon whether the property so delivered constitutes a capital asset in the hands of the taxpayer.

*     *     *     *     *     *     *

(3) Generally, the period for which a taxpayer holds property delivered to close a short sale determines whether long-term or short-term capital gain or loss results.

(4) Thus, if a taxpayer makes a short sale of shares of stock and covers the short sale by purchasing and delivering shares which he held for not more than six months, the recognized gain or loss would be considered short-term capital gain or loss. If the short sale is made through a broker and the broker borrows property to make a delivery, the short sale is not deemed to be consummated until the obligation of the seller created by the short sale is finally discharged by delivery of property to the broker to replace the property borrowed by the broker.

have delivered to Bache on December 31, 1963, or thereafter, would Bache have permitted them to maintain their short position in Syntex and to establish a new long position in that stock, for the reason that if Bache were to do so it would be in violation of the stock exchange rules.[4] They therefore contend that the date of the delivery of the shares purchased to close their short position is irrelevant in the determination of the year in which their loss should be recognized. They point to section 1.461–1(a) of the Income Tax Regulations which provides that under the cash receipts and disbursements method of accounting amounts representing allowable deductions shall, as a general rule, be taken into account for the taxable year in which paid. It is their position that the principle enunciated in *Ruml* v. *Commissioner*, (C.A. 2) 83 F. 2d 257, and other cases [5] dealing with sales of stock held "long" are controlling on the basis of the facts here presented, although they do not contend that such principle is governing in all short-sale cases. Such principle is that delivery is not always a prerequisite to the realization of a loss; that it is enough that the obligation to deliver is so fixed that the loss is reasonably certain in fact and ascertainable in amount.

The petitioners further argue that section 1233 of the Code and the regulations promulgated thereunder do not deal with the question of when a loss resulting from a short sale should be recognized, but are directed to the determination of whether a recognized loss is capital or ordinary and, if the former, whether short or long term. They recognize that section 1.1233–1 of the regulations provides that a short sale is not deemed to be *consummated* until delivery of property to close the short sale, but contend that consummation of every act relating to a loss is not essential to the allowance of the loss under the principle of the cases referred to above.

The respondent contends that the cases involving the year of deduction of losses on sales of stock held long are not governing, since in such cases the taxpayer's obligation to deliver stock which he owns

---

[4] At the trial the petitioners presented the testimony of the assistant credit manager of Bache for the purpose of establishing, among other things, that there was nothing that the petitioners could have done, after the purchases on Dec. 27 and 30, 1963 of Syntex stock, to preclude the application of such stock to close out their short position. This witness was well qualified and there is no question as to his credibility. However, his testimony upon this point was not entirely clear. We construe his testimony as being to the effect that such stock would have to be applied to close out the short position only because it was necessary in order to comply with stock exchange rules relating to minimum maintenance requirements. It was not established that any other rule of the stock exchange would be violated if stock purchased for the purpose of closing a short position should, upon delivery, be held long, provided the customer furnished enough collateral to meet both the cost of such stock and the minimum maintenance requirements of the stock exchange.

[5] The petitioners also cite, among other authorities, *Commissioner* v. *Dashiell*, (C.A. 7) 100 F. 2d 625, affirming 36 B.T.A. 313; *Commissioner* v. *Mott*, (C.A. 6) 103 F. 2d 1009, affirming 35 B.T.A. 195; *Commissioner* v. *Robinson*, (C.A. 6) 103 F. 2d 1009, affirming a Memorandum Opinion of this Court; *Francis S. Appleby*, 31 B.T.A. 533 (appeal dismissed C.A. 2, October 1935); and G.C.M. 21503, 1939–2 C.B. 205.

is fixed and the tax consequences of the transaction cannot be altered by any subsequent action of the taxpayer, whereas in the case of a short sale the seller has some flexibility until the short position is closed by delivery of the covering stock. He argues that prior to that time stock ordered to be bought for the purpose of covering the short sale could be retained as long stock if, for example, the short seller should furnish the broker with enough money or securities to provide for the purchase of the stock and to meet the necessary margin requirements. For this reason, the respondent contends, it cannot be considered that the loss is definitely fixed until the short transaction is closed by the delivery of stock to the broker to replace the stock which was borrowed.

We think that the position taken by the respondent must be sustained. Section 1.1233–1 of the regulations provides that for income tax purposes a short sale is not deemed to be consummated until delivery of property to close the short sale. Such regulations further provide that if a short sale is made through a broker and the broker borrows property to make a delivery, the short sale is not deemed to be consummated until the obligation of the seller created by the short sale is finally discharged by delivery of property to the broker to replace the property borrowed by the broker. All the income tax regulations, commencing with article 117–6 of Regulations 86 (promulgated under the Revenue Act of 1934), have contained almost identical language.

It is to be noted that the regulations provide that "for income tax purposes" a short sale is not deemed to be consummated until delivery of property to close the short sale. We think that this language was intended to, and should be construed as, providing the test, among other things, of when gain or loss on a short sale transaction is to be deemed realized.

This and other courts have heretofore considered the nature of short sales and have recognized that the tax consequences thereof differ from the tax consequences of sales of property held long.

In *H. S. Richardson*, 42 B.T.A. 830, affd. (C.A. 2) 121 F. 2d 1, certiorari denied 314 U.S. 684, we held that gain or loss sustained upon short sales of stock was not realized until delivery of stock to replace the stock originally borrowed to make the short sales. There the taxpayer had purchased and received in 1 year stock which he intended to use to cover the short sales but did not actually deliver it for that purpose until the following year. In that case we stated in part:

The mechanics of and the factors involved in a short sale as compared with an ordinary sale have been discussed extensively in numerous prior decisions and need not be set forth herein, except briefly. In an ordinary sale the seller sells and delivers his own shares to the purchaser, thus closing his transaction. In contra-distinction, the seller, in a short sale, sells shares which he does not own

and uses borrowed shares for making delivery to the purchaser, and, further, his transaction, which originated in a short sale, is not closed until he covers the short sale by delivery of similar shares to the lender to replace the borrowed shares. A sale which is initially made as a short sale sets in motion the short sale process and forever remains a short sale, regardless of whether it is covered, as is ordinarily the case, by delivery to the lender of shares purchased and immediately used for that purpose, known as a "covering purchase", or, whether it is closed by delivery to the lender of shares acquired prior to and not immediately coincident with the return of borrowed shares to the lender. See *Provost v. United States*, 269 U.S. 443; *DuPont v. Commissioner*, 98 Fed. (2d) 459; certiorari denied, 305 U.S. 631; *Robert W. Bingham*, 27 B.T.A. 186; *Frances Bartow Farr, Executrix*, 33 B.T.A. 557; *Arthur S. Kleeman*, 35 B.T.A. 17, 23; *Henry F. duPont*, 38 B.T.A. 1317; affd., 110 Fed. (2d) 641; and *William R. Tracy*, 38 B.T.A. 1366 (on appeal).

See also discussion of short sales in *Frances Bartow Farr, Executrix*, 33 B.T.A. 557.[6]

In *Betty Klinger*, 8 T.C.M. 546 (entered June 2, 1949), there was presented essentially the same situation as is involved herein. There, at the taxpayer's direction, a broker purchased stock on December 29 and 30, 1944, to cover her short sale. At the time of the order to cover, December 29 and 30, 1944, the taxpayer had sufficient funds as a credit with her broker to pay for such stock. The settlement date was January 3, 1945, at which time the stock so purchased was delivered to the lender to complete the covering of the short sale. There the taxpayer made substantially the same arguments as are made herein. We there approved the determination of the respondent, which was based upon section 29.117-6 of Regulations 111, that the taxpayer was not entitled to a claimed short-term capital loss on the transaction for the taxable year 1944. In so holding, we stated:

On her return for 1944 and in this proceeding petitioner claims the right to deduct, as a short-term capital loss under section 117(a)(3) and (b) of the Internal Revenue Code, and Regulations 111, section 29.117-6, the difference

---

[6] In the *Farr* case we stated in part:

"If the seller's broker "borrows" the stock, he must keep on deposit with the "lender" the current market price of the stock "borrowed." The broker who makes the short sale for his customer receives the purchase price from the purchaser. He, therefore, has this money available with which to make the deposit with the "lender." He will also require his customer to keep on deposit with him a sufficient margin to protect him against market fluctuations in the stock. The "borrowed" stock must be returned eventually. The transaction which originated in the short sale may be closed by the return of stock purchased just for that purpose. This is called a "covering purchase." The transaction may also be closed by the short seller delivering, in return for those "borrowed", certificates which he had purchased at an earlier date. When certificates are returned to the "lender" he releases the deposit made by the broker for the seller. *Regardless of the method of accounting used by the seller's broker, whatever balance there is in the account is completely available to the short seller for the first time when the transaction is closed by the delivery of shares which are to be returned to the lender.* * * *

    *        *        *        *        *        *        *

"One of the chief differences between a regular sale and a "short sale" is that, in the former, the seller delivers his own shares to the purchaser and thus closes the transaction, while in the latter, he delivers "borrowed" shares and the transaction is not closed so far as the seller is concerned until he delivers shares to repay the "loan." * * *"

between her cost of the "short" stock, to wit: $39,773.99 and its selling price, $31,128.99. That claim and its denial present the first issue. As argued by respondent, we think this issue has been decided adversely to petitioner in *Commissioner* v. *Levis' Estate*, 127 Fed. (2d) 796; certiorari denied 317 U.S. 645. See also *Provost* v. *United States*, 269 U.S. 443; *H. S. Richardson* v. *Commissioner*, 121 Fed. (2d) 1; certiorari denied, 314 U.S. 684.

We think the decision reached in that case was correct.[7] We therefore disagree with the contention of the petitioners herein that the fact that stock was purchased in 1963 for the purpose of covering the short sales and the fact that they had delivered to Bache in 1963 cash and securities sufficient to meet the cost of such stock are sufficient to establish that their losses were sustained in 1963. We approve the respondent's determination on this issue.

*Decision will be entered under Rule 50.*

---

[7] The cases of *Provost* v. *United States*, 269 U.S. 443, and *Commissioner* v. *Levis' Estate*, 127 F. 2d 796, cited in *Klinger*, did not involve the question of when gain or loss is sustained on a short sale transaction, but the discussions of short sales contained therein support the decision in that case.

In the *Provost* case the Supreme Court stated in part:

"the short sale transaction and the borrowing transaction as well are brought to their conclusion by the actual purchase of stock of which the customer was short at the time when the sale was made and the delivery of the stock, thus purchased, to the lender. * * *"

In the case of *Levis' Estate* it was stated in part:

"Upon a short sale no gain or loss can be realized by the seller until the transaction is closed by a covering purchase and a settlement with the lender of the borrowed stock. * * *"