*Decision will be entered under Rule 50.*

H. S. RICHARDSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 90663. Promulgated September 27, 1940.

*Joseph M. Hartfield, Esq.,* and *Josiah Willard, Esq.,* for the petitioner.

*Walt Mandry, Esq.,* for the respondent.

TYSON: This proceeding seeks redetermination of a portion of an income tax deficiency, in the amount of $199,608.87, for the calendar year 1933.

The petitioner assigns error in the respondent's determination (1) that petitioner is taxable upon the income of five trusts created in 1932 by his wife with securities theretofore transferred to her by him; (2) that petitioner realized a taxable gain of $98,214 in 1933, as a result of certain transactions carried out in 1932 and 1933 in the stock of Drug, Inc.; and (3) that petitioner received taxable dividends of $3,151.10 from the Vick Financial Corporation in 1933. The questions presented for this Board's redetermination will be hereinafter more fully set forth in our separate consideration of each issue.

FINDINGS OF FACT.

The petitioner and his wife, Grace Jones Richardson, are and have been residents of Connecticut since 1928. Prior to that time they were residents of Greensboro, North Carolina. In 1932 the oldest of their five children was seventeen and the youngest was four years of age. Since 1906 petitioner has been continuously engaged in the drug business originated by his father and subsequently conducted by the Vick Chemical Co., a corporation, of which petitioner is now chairman of the executive committee, and his brother, Lunsford Richardson, is chairman of the board of directors. The petitioner's wife has never engaged in business.

In 1925 the Piedmont Finance Co. was incorporated under the laws of Delaware and in 1928 its name was changed to "Piedmont Financial Company, Inc.," hereinafter referred to as the holding company. That company was organized solely as a holding company, with an authorized capital stock of 100,000 no par value shares, of which 75,000 shares were issued to petitioner and 25,000 shares were issued to his brother, Lunsford. At the time of its organization its principal asset consisted of Vick Chemical Co. stock, which was exchanged for Drug, Inc., stock in 1930 when the Vick Chemical Co. and four other drug companies became subsidiaries of Drug, Inc. In August 1933 Drug, Inc., dissolved and distributed the stock of its subsidiaries.

In 1928 the Piedmont Financial Co., a New York corporation (hereinafter referred to as the management company) was organized solely for the purpose of managing the numerous and varied incorporated enterprises, certain investments, and certain accounts of petitioner and his brother Lunsford. It also acted as financial manager for the members of their respective families. The affairs of that company were under the supervision of Calvin Wylie and George R. Dawson, the latter of whom, as petitioner's chief assist-

ant, looked after the personal business affairs of petitioner and his wife.

The foregoing facts pertain generally to the issues herein. Hereinafter we shall make findings of fact as they especially pertain to each separate issue, together with our opinion thereon.

## *Issue 1.*

FINDINGS OF FACT: In or about July 1931 the petitioner decided to divide his estate with his wife and he asked the management company to select the best securities to be given her and to prepare the necessary forms. That company recommended that petitioner transfer to his wife 57,500 shares of stock of the holding company, which at that time held Drug, Inc., stock received in exchange for the original Vick Chemical Co. stock. At that time the 57,500 shares of the holding company stock had a value of approximately $4,000,000 and constituted about one-half of the petitioner's estate.

On July 3, 1931, petitioner executed an assignment and stock transfer power transferring 57,500 shares of holding company stock to his wife, Grace Jones Richardson, for no consideration, and delivered the same to George R. Dawson, together with two stock certificates representing petitioner's 75,000 shares of holding company stock. On the same date, and pursuant to petitioner's instructions, George R. Dawson, as secretary of the holding company, canceled the stock certificates for 75,000 shares and issued, in lieu thereof, a new certificate for 57,500 shares in the name of Grace Jones Richardson and another new certificate for 17,500 shares in the petitioner's name. On the stock book of the holding company, Grace Jones Richardson was registered as the owner of 57,500 shares of stock of that company and the certificate for such shares was placed with her other securities in petitioner's safety deposit box in Greensboro, North Carolina, to which only the petitioner, his brother Lunsford, and Dawson had access.

On July 4, 1931, petitioner told his wife that he had completed a gift to her of 57,500 shares of the holding company stock having a value of about $4,000,000. She expressed her gratitude and asked petitioner what she should do with the stock. He explained the function of the management company and advised his wife to let that company continue its management of the stock, which she agreed to do. At that time there was no agreement or understanding between petitioner and his wife that he should have any continued dominion and control over the shares. Also at that time there was no discussion between them as to the creation of any trusts.

The stock certificate, dated July 3, 1931, for 57,500 shares was never delivered to Grace Jones Richardson personally, and she never saw that certificate until the hearing on this proceeding. She left

all of her business affairs entirely in the hands of George R. Dawson, who, from time to time, advised her of his acts on her behalf and presented papers prepared for her signature. From July 3, 1931, to May 15, 1932, petitioner's wife did not endorse the certificate for 57,500 shares and did not execute any assignment or stock power in connection therewith, and the petitioner did not make any use of such stock.

In March or April 1932, while the Federal Gift Tax Act of 1932 was pending before Congress, the petitioner and his wife, for the first time, had discussions as to the desirability of her creating trusts for the benefit of their children prior to the imposition of gift taxes. Their discussions embraced the proposed form of the trusts and, also, the degree of control to be exercised by them over the trusts so as to maintain a restraint on the children and to deprive them of any interest in the trusts should they become wasteful. They were advised by counsel that if Grace Jones Richardson, as grantor of the proposed trusts, retained a power of revocation she would be taxable upon the income of the trusts, but that if the petitioner was given such power then neither of them would be taxable upon such income.

The petitioner had a lawyer draw five trust instruments embodying the terms discussed by himself and his wife, the latter having determined the number of shares to be transferred in trust for the benefit of each of their five minor children. After reading those instruments, Grace Jones Richardson executed them in New York on or about May 15, 1932.

On or about May 16, 1932, Grace Jones Richardson executed five assignments and stock powers transferring to petitioner, as trustee in the above mentioned five trust instruments, 42,500 shares of the 57,500 shares of holding company stock theretofore transferred to her by petitioner. The stock powers and the stock certificate for the 57,500 shares of the holding company stock standing in Grace Jones Richardson's name were delivered to Dawson, who, as secretary of the holding company, on May 17, 1932, canceled that stock certificate and issued a new certificate, No. 15, to Grace Jones Richardson for 15,000 shares and five new certificates, Nos. 10 to 14, inclusive, to petitioner as trustee for each of the five children, respectively, in the amounts of 12,500 shares for each of the three sons and 2,500 shares for each of the two daughters. Certificate No. 15 was placed in the petitioner's safe deposit box in Greensboro, North Carolina, and remained standing in Grace Jones Richardson's name until she created certain other trusts for her children in 1934 with 4,650 of such shares and retained the remaining 10,350 of such shares, which retained shares are still standing in her name. Certificates Nos. 10 to 14, inclusive, together with the above mentioned trust instruments

for the benefit of the children, were placed in a separate safe deposit box in Greensboro in the name of H. S. Richardson.

Each of the five trust agreements dated May 15, 1932, for the benefit of petitioner's five children, are identical in form except as to the name of the beneficiary and the amount of stock embraced therein. The agreements were entered into by Grace Jones Richardson as "Grantor" and H. Smith Richardson (petitioner) as "Trustee" and provide, *inter alia*, that the former assigned and transferred to the latter specified shares of holding company stock in trust for certain uses and upon certain conditions and powers, as are immediately hereinafter set out.

The trustee is directed to hold, invest, and reinvest the principal, collect the income therefrom, and in his discretion to apply so much of the income as he deems advisable to the "Beneficiary's maintenance, education or benefit", until the latter becomes 21 years of age, and thereafter to pay so much of the income as he deems advisable to the beneficiary until the latter becomes 35; to accumulate and invest the undistributed trust income and pay over such accumulations to the beneficiary upon his reaching 35 years of age; and thereafter to pay the income of the trust to the beneficiary for life.

The trust is to terminate upon the death of the beneficiary and the principal and any unpaid accumulation is to be paid over to the beneficiary's descendants, or, in certain events, to his brothers and sisters in a certain manner.

The trustee is given "full power and authority, in his absolute and uncontrolled discretion", to sell or exchange the trust property at any time for such price as he deems advisable and to reinvest the proceeds in any character of property, real or personal, although it may not be of the character permitted by law for the investment of trust funds; to expend trust income and proceeds in "payment of premiums for life insurance" upon the lives of the grantor or petitioner; to purchase real or personal property from the grantor or petitioner and to make secured or unsecured loans to them without liability "in any way for any loss resulting to the trust estate by reason of such purchase or loan", and, further, to cause the trust securities to be registered in his name as trustee, or in his own name, or in the name of his nominee, and, also, to join in or become a party to any reorganization, merger, or exchange affecting any trusteed securities. The trust agreement further provides:

*Eleventh:* During his lifetime, H. Smith Richardson, husband of the Grantor, may cancel and terminate this agreement by an instrument in writing duly executed and acknowledged and filed with the Trustee or Trustees then acting, and upon such termination and cancellation the said H. Smith Richardson shall be entitled to receive the corpus of the trust fund absolutely and free from all trusts.

During the year 1933 the only distribution made by the holding company to its stockholders was a dividend of $2.85 per share, paid in

the form of its notes, dated July 15, 1933, payable on demand and bearing interest at 2 percent per annum. Such notes, plus interest due thereon, were paid by the holding company on or about February 16, 1934.

Throughout the year 1933 the petitioner, as trustee, continued to hold, as the principal of the five above mentioned trusts, the aggregate of 42,500 shares of holding company stock and during that year he received as dividends on such stock five notes aggregating $121,125, made payable to his order as trustee for each of his five children. Those trusts had no other income during 1933 and the amounts of the respective notes were included in the 1933 income tax returns filed by petitioner as trustee for each of the five trusts, respectively.

During 1933 Grace Jones. Richardson received a demand note for $42,250, payable to her, as a dividend on the 15,000 shares of holding company stock standing in her name. Upon payment of that note in February 1934 the proceeds were deposited in her separate bank account and the amount of such dividend was included in her individual income tax return for 1933.

The five trusts created by Grace Jones Richardson on May 15, 1932, are still in existence. The petitioner has not exercised his power of revocation of such trusts and he has not commingled any of the trust funds with his own properties. Petitioner has not used any of the income of the trusts for his own benefit, but has accumulated and invested such income except for small distributions to his two daughters. The details of handling the trust properties have been left to Calvin Wylie, manager of the management company, and George R. Dawson.

In addition to the transfer of 57,500 shares of holding company stock from petitioner to his wife on July 3, 1931, there were other transfers of stock between them prior and subsequent to that date, as follows:

On or about December 26, 1930, there were transferred from petitioner to his wife 6,000 shares of stock of the Vick Financial Corporation. In the same year such stock was transferred from petitioner's wife to the holding company in consideration for its check for $29,976, which check was endorsed by her and deposited in petitioner's bank account. On account of such sale, petitioner's wife claimed a loss deduction on her 1930 income tax return.

On or about June 24, 1931, there were transferred from petitioner to his wife 10,000 shares of stock of the Vick Financial Corporation. Subsequently, during the same year, she sold such stock to the holding company for $53,212.99, of which amount $25,600 was credited on a note of hers to the holding company, and the balance, or $27,612.99, was set up on the holding company's books as a credit

to her. In 1932 petitioner's wife instructed the holding company to transfer the credit of $27,612.99 to petitioner, which was done. On account of that sale in 1931 petitioner's wife claimed a loss deduction on her tax return for that year.

The transactions described in the next two preceding paragraphs were initiated by the officers of the management company for the purpose of establishing losses for income tax purposes, and at the hearing on this proceeding neither the petitioner nor his wife had any recollection of those transactions.

On or about May 27, 1932, petitioner transferred to his wife 147,538 shares of stock of the Vick Financial Corporation. On December 13, 1932, 107,628 of these shares were transferred from petitioner's wife to the holding company in consideration for the latter's check for $537,709.48, which check was endorsed by petitioner's wife and deposited in petitioner's bank account. Subsequently, that amount was included in certain notes executed by petitioner to his wife. In her 1932 tax return Mrs. Richardson claimed a loss deduction on account of such sale. The transfer on May 27, 1932, was initiated by petitioner and was made for the purpose of supplementing his wife's estate following her creation of the above mentioned five trusts on May 15, 1932. Petitioner's wife left the management of those 147,538 shares of Vick Financial Corporation stock entirely in Dawson's hands, and, at the hearing, neither she nor the petitioner had any recollection of what disposition was made of them.

The respondent has included in petitioner's taxable income for 1933 the amount of $121,125, representing the dividends paid on the 42,500 shares of holding company stock transferred to petitioner on May 16, 1932, as the trustee of five trusts for the benefit of his five children. Such action was based on the respondent's determination that the petitioner did not make a valid gift to his wife of the securities forming the corpus of the five trusts created by her; that petitioner was thus, in reality, the donor of the corpus of the five trusts and therefore, in substance, the grantor of those trusts, which were revocable by him. The respondent further determined that the corpus of each of the five trusts created by his wife was subject to petitioner's unfettered command, absolutely free from all trusts.

OPINION: The first issue, as to whether the respondent erred in taxing to petitioner for 1933 the income of five trusts set up by petitioner's wife for the benefit of their minor children, with securities theretofore given her by him and as to which he had the power of revocation in favor of himself absolutely, in turn presents the following questions for our consideration:

(1) Whether the petitioner's transfer of holding company stock to his wife in July 1931 was a valid gift, by reason whereof she

became the owner of such stock and thus was, in reality, the grantor of the five trusts involved herein, as contended by petitioner, or, whether such transfer was an invalid gift, a sham, and a device by which petitioner did not intend to divest himself of control of such stock, and, consequently, petitioner remained, in substance, the owner of the stock and was therefore the grantor of the trusts, having the power of revocation thereof, and, accordingly, is taxable under section 166 of the Revenue Act of 1932, as contended by respondent.

(2) Whether the petitioner's individual command and control over the corpus of each of the trusts was such that, even if he was not the grantor thereof, he nevertheless was, in substance, the owner thereof, and, accordingly, taxable on the income therefrom under section 22 (a) of the Revenue Act of 1932.

The record herein shows that the petitioner's transfer of 57,500 shares of holding company stock to his wife in July 1931 was without any consideration and was not a sale. The record further shows that such transfer embraced all of the formal elements of a gift in that the petitioner made a transfer through the actual issuance of new stock certificates to his wife, as donee; that he made a delivery of the stock to her; and that his wife signified her acceptance thereof as a donee. While there would thus appear to have been a gift, *pro forma*, there are two other elements essential to a valid gift by petitioner to his wife, i. e., (1) that he had an unmistakable intention to absolutely and irrevocably divest himself of the title, dominion, and control of the holding company stock *in praesenti*, and (2) that he made such an irrevocable transfer of the title, dominion, and control of the stock to his wife that he could exercise no further act of dominion or control over it. Cf. *Adolph Weil*, 31 B. T. A. 899, 906; affd., 82 Fed. (2d) 561; certiorari denied, 299 U. S. 552; and *Oscar G. Joseph*, 32 B. T. A. 1192. In the instant case the controversy revolves around the latter two elements, which the petitioner has the burden of establishing to overcome the prima facie correctness of respondent's determination that the purported gift lacked substance and validity because petitioner retained dominion and control over the stock.

In cases involving *pro forma* gifts between husband and wife, where it has been found as a fact that at the time the ostensible gift was made there was an understanding between the parties that the husband did not thereby relinquish his control and dominion over the *res*, it has been held that no valid gift was made: *Jackson* v. *Commissioner*, 64 Fed. (2d) 359; *Guaranty Trust Co. of New York et al., Executors*, 35 B. T. A. 916; affd., 98 Fed. (2d) 62; *F. Coit Johnson*, 33 B. T. A. 1003; affd., 86 Fed. (2d) 710; and *Oscar G. Joseph*, *supra*. On the other hand, in similar cases where it has been found as a fact that at the time the gift was made there was no understanding as to what disposition the wife should make of the prop-

erty involved, and the husband actually relinquished control over the *res*, it has been held that the gift was valid and not mere form. *Walter W. Moyer*, 35 B. T. A. 1155, 1161, and *D. B. Malernee*, 31 B. T. A. 662.

The case of *Richardson v. Smith*, 102 Fed. (2d) 697, involved an action by Lunsford Richardson to recover income taxes collected from him upon the income of five trusts created by his wife with shares theretofore given her by him, and the material facts therein are very similar to those in the instant proceeding. There, the District Court found that the transfer was not "a gift made with donative intent", grounded, apparently, upon a showing that Lunsford believed he could control his wife's action, and the court upheld the Commissioner's view that the gift of shares to the wife was invalid and that Lunsford was the real grantor of the trusts. In reversing the lower court and ordering a new trial, the Circuit Court said that "Since the judge did not make any finding that at the time of the transfer there was any understanding between the spouses that the wife would deal with any part of the shares as the husband directed, we must dispose of the case on the assumption that there was none, * * *." The court further said that while existence of a mutual understanding between the parties to a transaction may be gathered from their relations, "the donor's belief, though well founded, that he can prevail upon the donee to comply with his demands, is alone not enough." Also, the court ruled that a series of other transactions between the parties, some similar to those in the instant case, were admissible as evidence bearing upon the mutual intent of the parties in the transfer in controversy.

In the instant proceeding we have found as a fact that, at the time petitioner transferred the 57,500 shares of holding company stock to his wife as a gift, there was no agreement or understanding between them that he should have any continued dominion and control over the shares. Such finding is based upon the positive testimony herein to that effect, which, in our opinion, must be accepted as having greater weight than the other facts of record which tend to show that petitioner's wife has been compliant with his wishes with respect to the use, for his benefit, of property transferred to her by him.

As to the first question presented by the first issue, we conclude that the petitioner's gift of 57,500 shares of holding company stock to his wife in July 1931 was a valid one, that she was, in reality, the grantor of the five trusts involved herein, and, accordingly, that the respondent erred in his determination that petitioner is taxable upon the income therefrom as the grantor having the power of revocation of such trusts under the provisions of section 166, *supra*.

As to the second question presented by the first issue, we are of the opinion that petitioner is taxable upon the income of the five trusts for 1933, under section 22 (a), *supra*, for the reason that when his wife transferred 42,500 shares of holding company stock to petitioner, as trustee under their five trust agreements of May 15, 1932, she, in substance, thereby made a gift of such shares to petitioner, individually. Under the terms of each of those agreements the petitioner had complete control of the use of the *res*, even to the extent of making unsecured loans thereof to himself or his wife without liability for any resulting loss of the funds. He had control of the use of the income from the *res* to the extent of paying premiums for life insurance upon the lives of himself and his wife and, of greater importance, petitioner, individually, at any time during his life, had the power to cancel and terminate the trust agreements and to thereupon take over the trust corpus as his own property absolutely and free from all trusts.

Under the facts in the instant case we are not so much concerned with the refinements of title to the property which has been ostensibly passed around the immediate family circle as with the actual dominion and control over the property. Here, the property and the income therefrom is so clearly subject to the petitioner's unfettered command that they are, in substance, his and, even though he did not see fit to use the property or the income during the taxable year, the latter may be taxed to petitioner as his income under the broad general tax provisions of section 22 (a) *supra*. Cf. *Corliss* v. *Bowers*, 281 U. S. 376; *Burnet* v. *Wells*, 289 U. S. 670; *DuPont* v. *Commissioner*, 289 U. S. 685; *Helvering* v. *Clifford*, 309 U. S. 331; *Lehman* v. *Commissioner*, 109 Fed. (2d) 99, affirming 39 B. T. A. 17; *City National Bank & Trust Co.* v. *United States*, 109 Fed. (2d) 191; *Albert Penn* v. *Commissioner*, 109 Fed. (2d) 954; *First National Bank of Chicago* v. *Commissioner*, 110 Fed. (2d) 448; *Cox* v. *Commissioner*, 110 Fed. (2d) 934; *Helvering* v. *Hormel*, 111 Fed. (2d) 1; and *Morton Stein*, 41 B. T. A. 994.

## Issue 2.

FINDINGS OF FACT: The Piedmont Financial Co. of New York (heretofore and hereinafter referred to as the management company) maintained various custodian accounts with the Bankers Trust Co. of New York as agent for the petitioner and his brother, for the members of their families, and for their various enterprises, respectively. The various accounts were given numbers, as for example, "Piedmont No. 1", which was the account of the holding company, and "Piedmont No. 2", which was the petitioner's personal account. The Bankers Trust Co. acted upon the instructions of the management company as to the receipt or withdrawal of securities and funds for those various accounts.

In February 1932 the petitioner decided to make short sales of Drug, Inc., stock and instructed the management company as his agent to make such sales on his behalf. The management company thereupon opened a new custodian account for petitioner with the Bankers Trust Co., known as the "Piedmont Account No. 18", for convenience in carrying out petitioner's instructions.

The management company opened on its own books "Account No. 18 H. S. Richardson, Drug Incorporated, Short Account" (hereinafter referred to as short account No. 18) for petitioner and, in the regular course of its business, maintained such account from February 25, 1932, until it was closed on July 17, 1933. In that account the management company recorded, at the time of each transaction, the large number of sales and purchases of Drug, Inc., stock made during that period at the direction of the management company and on behalf of petitioner.

For the purpose of making deliveries against his proposed short sales and instead of borrowing shares from brokers, the petitioner borrowed, from time to time during 1932, a total of 25,700 shares of Drug, Inc., stock from the Piedmont Financial Co. of Delaware (heretofore and hereinafter referred to as the holding company) and a total of 2,000 shares of Drug, Inc., stock from the Piedmont Development Corporation, and such shares as were borrowed were placed in his custodian account with the Bankers Trust Co. Also, for the same purpose, petitioner borrowed 2,000 shares of Drug, Inc., stock from Dawson-Smith on July 27, 1932, and returned them to the lender on August 22, 1932, apparently by using for that purpose the 2,000 shares borrowed from the Piedmont Development Corporation on the same date. The 2,000 shares borrowed from the Piedmont Development Corporation were not returned to it until June 29, 1933, and the 25,700 shares borrowed from the holding company were not returned to it until July 21, 1933, shortly after the short account No. 18 with the management company was closed out.

The sales, deliveries, and purchases in short account No. 18 were made in the following manner: The management company, as petitioner's agent, instructed its brokers, members of the Stock Exchange, to sell a certain number of Drug, Inc., shares and when the broker confirmed the sale the management company instructed the Bankers Trust Co., the custodian, to deliver to the broker the number of shares sold and to receive as custodian the sale price from the broker for the benefit of short account No. 18. Purchases were made by the management company's instruction to the broker to buy a certain number of Drug, Inc., shares, and upon confirmation of the purchase, the management company would instruct the Bankers Trust Co. to receive as custodian the purchased shares and make payment to the broker of the purchase price from the custodian account in behalf

of short account No. 18. The shares so purchased were held by the bank in the name of its nominee, "the Street name." All of the purchases made for short account No. 18 were matched against the earliest sales in that account not theretofore matched, for the purpose of reflecting the gain or loss on such sales.

In short account No. 18 each sale was reflected by entries of the date, the name of the broker making the sale, the number of shares sold, the "short balance" in shares as increased by the sale on that date, the sale "price" per share, the "proceeds of sale", and the net "short balance" in dollars and cents as increased by the proceeds of the sale on that date. Each purchase was reflected in that account by entries of the date, the name of the broker making the purchase, the number of shares bought, the "short balance" in shares as decreased by the purchase on that date, the purchase "price" per share, the total "cost debit", the "profit or loss" represented by the difference between the selling price and the purchase price of the matched sale and purchase, the "cost credit" represented by the cost plus the profit or minus the loss, and the net "short balance" in dollars and cents as decreased by such cost credit on that date.

There is no controversy herein as to the amount of the sale price and the purchase price of each sale and purchase made by petitioner, respectively, as reflected in short account No. 18, which is in evidence as Exhibit No. 13. Those transactions being too numerous to set forth herein in detail, "Short Account No. 18" is adopted as part of our findings of fact and incorporated herein by reference. The numerous sales and purchases made between certain dates, as shown in short account No. 18, are summarized in the first three columns of the following tabulation, and in the last column thereof are shown the dates and number of shares borrowed by petitioner in connection with his sales and for the purpose of making deliveries to purchasers:

| First and last date of period | Total shares sold | Total shares bought | Shares borrowed | |
|---|---|---|---|---|
| | | | Dates | Shares |
| 1932 | | | 1932 | |
| Feb. 25 to Mar. 9 | 19,800 | | Feb. 25 to Mar. 7 | 19,800 |
| June 23 to June 30 | | 1,300 | | |
| July 14 to July 15 | 1,300 | | | |
| July 16 to Aug. 1 | 7,900 | | July 18 to July 27 | 7,900 |
| Sept. 29 to Oct. 19 | | 13,800 | | |
| Oct. 20 | 100 | | | |
| Oct. 21 to Oct. 26 | | 6,700 | | |
| 1933 | | | | |
| Jan. 11 to Mar. 24 | 4,700 | | | |
| Mar. 31 to Apr. 19 | | 4,200 | | |
| Apr. 20 | 700 | | | |
| May 2 to May 25 | | 4,600 | | |
| May 26 | 300 | | | |
| July 17 | | 4,200 | | |
| Total | 34,800 | 34,800 | | 27,700 |

For the year 1932 petitioner computed, as a profit realized through short account No. 18, the amount of $377,043, representing the excess of the proceeds of sales over the cost of all matched purchases made during 1932. On his income tax return for 1932 petitioner reported such profit as income and he claimed as a deduction the short dividends totaling $75,200 paid to the lenders of borrowed shares during 1932. For the year 1933, petitioner computed, as a loss sustained through short account No. 18, the amount of $158,076.50, representing the excess of the cost of matched purchases made during 1933 over the proceeds of prior sales. On his tax return for the taxable year 1933, petitioner claimed a deduction of such $158,076.50 as a loss and also claimed as a deduction the short dividends totaling $41,500 paid to lenders of the borrowed shares during 1933.

In his deficiency notice for the year 1933 the respondent stated that the amount of $377,043, reported in petitioner's 1932 return as a profit from short account No. 18 had been eliminated for that year because the transactions had not been completed by a return of the borrowed shares to the lenders in that year. The respondent determined that the 1,300 shares purchased between June 23 and June 30, 1932, were sold on July 14 and 15 of that year as regular or long sales, resulting in a profit of $4,002.50 taxable in the year 1932. He determined that all of the other transactions embraced in short account No. 18 during the period February 25, 1932, to July 17, 1933, were transactions with borrowed shares and that as to petitioner such transactions were not completed and closed until he returned the 27,700 borrowed shares to the lenders in June and July 1933. The respondent further determined that through short account No. 18, and during the period February 1932 to July 1933, the petitioner realized a profit of $98,214 taxable for the year 1933, computed as follows:

*Profit*—represented by the excess of the proceeds of all sales over the cost of all purchases during 1932 and 1933_____ $218,966.50
*Less* —short dividends on borrowed stock paid out during 1932 and 1933_____ 116,750.00

$102,216.50
*Less* —profit determined by respondent to be taxable in 1932 on purchase and sale of 1,300 shares_____ 4,002.50

Profit taxable for 1933_____ $98,214.00

OPINION: The second issue involves the question of whether petitioner sustained a loss of $158,076.50 representing the difference between the cost of all purchases made during the one year 1933 for short account No. 18 and the sale price of prior sales matched by such purchases, as claimed by petitioner, or, whether the respondent is correct in his determination, as above set forth, of a profit of $98,214 on all of the transactions for both of the years

1932 and 1933, except for the above mentioned item of 1,300 shares. Petitioner contends that all of the sales made for that account were short sales, on which profit or loss was realized at the time matched purchases were made during each of the years 1932 and 1933, separately, irrespective of the time the borrowed shares were returned to the lenders. Respondent has treated the sales as short sales, but contends that no gain or loss on the 1932 and 1933 transactions was realized until the borrowed stock was returned to the lenders in June and July 1933, except only the above mentioned 1,300-share transaction, which he contends was a regular, or long, purchase and sale during 1932.

The mechanics of and the factors involved in a short sale as compared with an ordinary sale have been discussed extensively in numerous prior decisions and need not be set forth herein, except briefly. In an ordinary sale the seller sells and delivers his own shares to the purchaser, thus closing his transaction. In contradistinction, the seller, in a short sale, sells shares which he does not own and uses borrowed shares for making delivery to the purchaser and, further, his transaction, which originated in a short sale, is not closed until he covers the short sale by delivery of similar shares to the lender to replace the borrowed shares. A sale which is initially made as a short sale sets in motion the short sale process and forever remains a short sale, regardless of whether it is covered, as is ordinarily the case, by delivery to the lender of shares purchased and immediately used for that purpose, known as a "covering purchase", or, whether it is closed by delivery to the lender of shares acquired prior to and not immediately coincident with the return of borrowed shares to the lender. See *Provost* v. *United States*, 269 U. S. 443; *Du Pont* v. *Commissioner*, 98 Fed. (2d) 459; certiorari denied, 305 U. S. 631; *Robert W. Bingham*, 27 B. T. A. 186; *Frances Bartow Farr, Executrix*, 33 B. T. A. 557; *Arthur S. Kleeman*, 35 B. T. A. 17, 23; *Henry F. duPont*, 38 B. T. A. 1317; affd., 110 Fed. (2d) 641; and *William R. Tracy*, 38 B. T. A. 1366 (on appeal).

In *Arthur S. Kleeman, supra*, a partnership which owned 31,000 shares of certain stock sold 25,835 shares of similar stock during 1929, but actually made deliveries with stock borrowed from the wife of one of the partners. During the same year the partnership purchased 7,256 shares, which were returned to the lender, so that at the end of 1929 it owed her 18,579 shares. The partnership's accounts carried such sales of stock as short sales. The Board held that, since the partnership intended to make short sales and, in fact, did make delivery with borrowed shares, the sales of 25,835 shares were short sales. The Board further held that during 1929 the partnership made covering

purchases only in the amount of 7,256 shares, which were properly matched against and used to cover the first 7,256 shares sold short for computing gain or loss. The Board also held that since the remaining 18,579 shares sold short in 1929 were not covered during that year, no gain or loss could be computed on those sales for that year.

In the instant case the petitioner intended to make short sales, and for the sales reflected in its short account No. 18 it did in fact use borrowed shares to make deliveries to the purchasers of 27,700 shares of Drug, Inc., stock so sold. As to petitioner's sales made from February 25 to March 9, 1932, totaling 19,800 shares, he made deliveries with a like number of shares borrowed between the dates of February 25 and March 7, 1932. Also, as to petitioner's sales made from July 16 to August 1, 1932, totaling 7,900 shares, he made deliveries with a like number of shares borrowed between the dates of July 18 and July 27, 1932. Those sales, totaling altogether 27,700 shares, were short sales which were not covered until in June and July 1933, when the petitioner returned the 27,700 borrowed shares to the lenders thereof. Accordingly, no gain or loss was realized on such short sales during 1932, but was realized during the taxable year 1933, involved in this proceeding.

The remaining sales reflected in short account No. 18 were not short sales, for deliveries to the purchasers were not made with borrowed shares because at the times such sales were made petitioner had no borrowed shares on hand; those sales having been made subsequent to August 1, 1932, when he had sold the entire amount of 27,700 shares which he had borrowed. When those sales were made, deliveries were in fact made with shares theretofore purchased and owned by petitioner at the times of such sales. Between June 23 and June 30, 1932, petitioner purchased 1,300 shares, which were not returned to the lender of the borrowed shares used in his prior short sales and thus were not used to cover any part of such short sales. Instead, petitioner held those 1,300 shares for his own use and he thus, in effect, had a long account of 1,300 Drug, Inc., shares. When petitioner made sales totaling 1,300 shares on July 14 and 15, 1932, he had no borrowed shares on hand with which to make delivery, but used his long shares for that purpose and such sales therefore constituted ordinary sales on which gain or loss was realized in 1932. For similar reasons the following other sales reflected in short account No. 18 were ordinary sales: Between September 29 and October 19, 1932, petitioner purchased and held a total of 13,800 long shares, out of which he made ordinary sales of 100 shares on October 20, 1932, and a total of 5,700 shares between January 11 and May 26, 1933, as shown in the tabulation set out in our findings of fact.

There is no controversy herein as to the correctness of the prices of all purchases and sales reflected in petitioner's short account No. 18, which is incorporated in our findings of fact by reference, and, by application of the first in, first out rule, the parties should recompute the gain or loss realized by petitioner from his ordinary sales totaling 5,700 shares made during the taxable year 1933.

As immediately hereinbefore held, the first 5,800 shares out of the 13,800 bought between September 29 and October 19, 1932, were sold during 1932 and 1933 as ordinary sales. The remaining 8,000 of such purchases, together with the subsequent purchases, amounting to 19,700 shares, during the period October 21, 1932, to July 17, 1933, or a total of 27,700 shares, were used to cover the petitioner's short sales made during 1932 by a return of the 27,700 borrowed shares to the lenders thereof during June and July 1933. Accordingly, petitioner's short sales were closed in 1933 and he is taxable in that year on the gain or loss thereon, which should be recomputed by matching the total purchase price of the last 27,700 shares purchased by petitioner against the total sale price of the 27,700 shares sold short, as such prices are reflected in short account No. 18. In connection with such computation of gain or loss, the short dividends which were paid by petitioner to the lenders of the borrowed stock during 1932 and 1933 should be treated as additions to petitioner's cost basis of his stock purchases used to cover his short sales, as to which treatment there is no controversy herein. See *Henry F. duPont, supra,* and *Gladys G. Terbell et al., Executors,* 29 B. T. A. 44; affirmed *per curiam,* 71 Fed. (2d) 1017.

On the second issue recomputation of petitioner's gain or loss for the year 1933 will be made under Rule 50 pursuant to the foregoing opinion.

### *Issue 3.*

FINDINGS OF FACT AND OPINION: The Vick Financial Corporation was organized in 1929. During 1931, by due corporate action, it reduced the par value of its capital stock from $10 per share to $5 per share, thereby transferring the amount of $5,250,000 from capital to capital surplus. On December 31, 1932, it had an accumulated operating deficit of $4,075,770.32.

During 1933 that corporation had earnings of $224,567.56 and in that year it made a distribution to its stockholders of $133,656.52, of which petitioner herein received $4,521.45.

Respondent determined that $3,151.10 of such distribution to petitioner constituted a taxable dividend, but on brief now concedes that the distribution was a return of capital and no portion thereof is tax-

able to petitioner for the year 1933. Proper adjustment of the item involved in this issue will be made under Rule 50.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

---

Murdock, dissenting: Although I do not subscribe to the reasoning upon the first point, nevertheless, the correct result is reached. But I feel that the short sales issue is incorrectly decided.

The sales involved were not transacted as short sales through a broker in accordance with the rules of the New York Stock Exchange. The broker bought and sold in the "regular way." However, the sales must be treated for tax purposes, at least, as short sales because each sale lacked a basis until a "matching purchase" was made. The petitioner borrowed a large supply of shares from his family corporations. The management company acted in his behalf and kept account of all transactions in short account No. 18. The finding is that "all of the purchases" "were matched against the earliest sales in that account not theretofore matched, for the purpose of reflecting the gain or loss on such sales" and the petitioner reported his gains and losses in accordance with that account. He apparently deemed unimportant the return of the borrowed shares to his family corporation. I think he made his reports correctly, the Commissioner erred, and the Board has made an unwise decision by attaching undue importance to the return of the shares.

While a short sale made with borrowed shares is not complete for all purposes until the borrowed shares are returned, nevertheless, that event is not essential to the completion of a taxable transaction where, as here, the short sales have already been "matched" by purchases. The "matching purchase" fixed the gain or loss and completed the transaction for taxing purposes. The petitioner is right in arguing that the matching purchases are not distinguishable from "covering purchases." They reduced the short balance in the account. Suppose the petitioner had never returned the borrowed shares to his family corporation, would he thereby escape tax forever? The rule here adopted by the Board will permit short sellers to choose their own tax year after their gain or loss has become fixed. Cf. *Ruml v. Commissioner*, 83 Fed. (2d) 257; *Commissioner v. Dashiell*, 100 Fed. (2d) 625; *Dee Furey Mott*, 35 B. T. A. 195. Surely, the Commissioner does not want such a rule established. I see no wisdom in it or justification for it.

Arundell, Smith, Van Fossan, Mellott, and Harron agree with this dissent.